438

SAVANNAH SHIP REPAIR COMPANY,
Plaintiff,

v.

HELLENIC LINES LIMITED and SS
HELLENIC LEADER, her engines,
boilers, etc., Defendants.

Civ. A. No. 2410.

United States District Court
S. D. Georgia,
Savannah Division.

Nov. 10, 1969.

Edward T. Brennan, Savannah, Ga., for plaintiff.

George H. Chamlee, Savannah, Ga., for defendant.

## JUDGMENT

LAWRENCE, District Judge.

Plaintiff ship repairer has sued Hellenic Lines, Ltd. and has libeled the "Hellenic Leader" for the value of certain repairs ($3,568.00) to the vessel's anchor windlass. The case was tried before the Court on November 5, 1969.

For causes undetermined the steel shaft of the windlass (27½" x 4½") had broken at or about the time the "Hellenic Leader" docked at Savannah on July 11, 1966. Mr. Nick Karacostas who owns Savannah Ship Repair Company was called by a representative of a naval engineering firm in New York and was requested on behalf of the shipowner to see the captain in respect to the early repair of the windlass.

Upon inspection, it was found that the shaft had sheared. Working round the clock for three days, plaintiff fabricated and installed a new one. Before undertaking the work Karacostas asked the Captain of the vessel for a drawing of the shaft for the purpose of precise measurement. None was available and plaintiff had to rely upon piecing the two broken ends together to obtain the dimensions.

The new shaft turned out to be one-fourth of an inch short. This fact was known to Andrew Smith, a Marine Surveyor for the American Bureau of Shipping who inspected the windlass. The Captain and Chief Engineer of the "Hellenic Leader" also knew that the new shaft was ¼" short. That fact would not affect adequate performance of the windlass since there was 96% contact between the pinion and bull gears, according to Surveyor Smith who reported to the American Bureau of Shipping as follows:

"The gear train from the electric motor to the main driving shaft was striped down and the shaft for the worm gear and the driving pinion found sheared through in way of driving pinion fit.

A new shaft was machined from tested material, driving pinion and

wor[m] gear fitted and keyed to place.

The gear train and casings were reassembled, windlass tried out by lowering the port anchor and raising same and windlass found in satisfactory operating condition.

It was noted that the pinion teeth were protruding approximately one quarter inch past the end of the bull gear teeth on the port side. The pinion fits up against a shoulder on the shaft and this could not be rectified without removing the shaft and machining the shoulder which would have delayed the vessel. This condition is not considered serious as the teeth have approximately ninety six percent contact surface."

Mr. Karacostas testified that the bearings on which the shaft rested were in line. After the shaft was installed the windlass was tested by running the electric motor for 40 minutes and by lowering and raising the anchor. The Master, Chief Engineer, Karacostas and Surveyor Smith were all satisfied with the way it operated. The latter considered the tests sufficient and recommended that the vessel "be retained in her present Class with this Bureau."

The Captain and Chief Engineer were present during most of the work of dismantling the windlass and the installing of the new shaft. They signed an acknowledgment on the work order that "All the above work carried out and completed to our satisfaction." The following was penned above their signatures: "Pinion gear is ½″ out of alignment with bull gear teeth to port. Tooth contact—good."

The work order provided, among other things, for furnishing "necessary labor and material and equipment as required to completely dismantle gear box[,] disconnect coupling between motor and driving gear for access to determine cause for not operating." Hellenic Lines denies liability because of negligence by plaintiff in failing to detect and correct the real source of the trouble in the windlass. Defendant suggests that it was the misalignment of the bearings and claims that that is what must have caused the subsequent twisting of the shaft. Contending that plaintiff's faulty workmanship required still another shaft to be fabricated at Baltimore and the windlass overhauled, Hellenic Lines counterclaims for $6,400. It maintains that the repairs were not performed in a skilled and workmanlike manner and that plaintiff breached the repairer's implied warranty in that respect by installing the shaft with improperly aligned bearings.[1]

The difficulty with defendant's claim of unskillfulness by Karacostas in performing the work is that everyone concerned with the windlass at Savannah deemed the only trouble to be the broken shaft. No one saw any misalignment of the new shaft and the old bearings. After the new shaft was installed the bearing alignment was tested by using feeler gauges.[2] Mr. Karacostas testified that the alignment was as good as could be accomplished. He stated that the Chief Engineer said that the bearings were "fine." Karacostas further contended that he was only instructed to replace the shaft. He characterized it as an emergency job.

■ Under the evidence, I cannot find that the repair work at Savannah was performed in an unworkmanlike manner. Too many people closely involved with the job thought otherwise, including the ship's officers and the Marine Surveyor.

1. As to the obligations of a ship repairer see Dog River Boat Service, Inc. v. The Frances D, 192 F.Supp. 759. It was said (p. 761): "In the instant case, if the work performed by the libelant was so poorly executed as to be of no benefit to the owner of the cruiser, then the libelant is not entitled to recover for the work done. * * * However, if the work done, though defective, was of some benefit or of some value to the respondent, then the libelant is entitled to recover for the value of the work and materials furnished."

2. The more accurate line bore alignment test could not be used because of the on-the-job location of the repair operation.

The evidence preponderates too heavily to warrant any other finding by me than that the work contemplated by the parties was properly performed.

The "Hellenic Leader" left Savannah on July 14, 1966, and stopped at Charleston the following day. From there she proceeded to New York. Mr. Jan Van Rynbach of the naval engineering firm mentioned went aboard her at Brooklyn. The Captain complained to him that the windlass was not working properly. He heard a noise which indicated an irregularity in the gears. After a stop at Philadelphia the vessel proceeded to Baltimore where she entred drydock for her annual lay-up on July 24th. Van Rynbach observed the dismantling of the windlass and testified that the shaft installed by plaintiff was bent and twisted "like a screw." He was of the opinion that the defect might have occurred at Savannah during the course of the fabrication or in the installation. According to this witness, three bearings that support the shaft were out of alignment and this "could well be the cause of the bending." A major overhaul of the windlass was necessary and was carried out at Baltimore along with numerous other repairs to the vessel. The total cost of repairs to the windlass was $9,415.00 and the cost of installing the new shaft was $6,400.

At the time Mr. Van Rynbach made his examination he had no knowledge that a claim would be made by Hellenic Lines against Savannah Ship Repair Company. No metallurgical or other test of the bent shaft was made. Mr. Karacostas was not notified that he was being held responsible for the damage. In each instance the broken shaft was discarded by defendant.

There is no question that the windlass shaft was not bent when the ship left Savannah. I cannot discredit Van Rynbach's statement as to its condition when he saw it at Baltimore. Apparently, there was no misalignment of the shaft at Savannah but there was at Baltimore. No one knows what happened to the windlass between Savannah and New York. In the interim the anchors were used.

We are left to conjecture and such is not enough on which to base liability of the plaintiff on the counterclaim. Speculation as to what Savannah Ship Repair did or did not do is insufficient. The thing does not speak for itself. Possibly by proper tests at Baltimore and closer investigation by experts Hellenic could have developed a more satisfactory basis for attributing the bending and twisting of the shaft to what plaintiff did or failed to do at Savannah. The shaft had broken in two before plaintiff replaced same at Savannah in July, 1966. There may well have been some defective condition in the windlass unconnected with the shaft proper and that Savannah Ship Repair Company failed to detect it. All of this is conjecture and surmise and falls short of carrying the burden of proof. I must find against Hellenic Lines on its counterclaim.

There remains only the question of whether interest should be allowed on the value of the repairs to the "Hellenic Leader." Award of interest in admiralty in unliquidated damage cases is in the discretion of the court. 3 Benedict on Admiralty, § 419, p. 191. Here, the cost of repairs to the windlass is liquidated. The complaint alleges that plaintiff performed same for the price of $3,568. Defendant admitted the allegation, asserting by way of defense that plaintiff's work was defective and faulty. This issue has been resolved against Hellenic Lines. Interest will be included at the rate of 7% per annum from September 18, 1966.[3]

Formal findings of fact and conclusions of law are unnecessary in the light of the above but if counsel deem additional findings desirable, they may submit same for consideration. Form of judgment will also be submitted.

3. I have used a sixty day period for payment.