**HOUSTON OILERS, INC., Plaintiff,**

v.

**HARRIS COUNTY, TEXAS, et al., Defendants.**

**Civil Action No. H-95-4193.**

United States District Court, S.D. Texas.

April 11, 1997.

Paul J. Dobrowski, Philip P. Sudan, Jr., Houston, TX, for Plaintiff.

James B. Sales, Linda L. Addison, Wayne Fisher, Houston, TX, for Houston McLane Co., Inc.

Eugene Clements, Houston, TX, for NFL.

Opinion on League Liability

HUGHES, District Judge.

1. *Introduction.*

 When the parties to a transaction agree to abide by the judgment of a third-party about performance of their agreement, the third party is not liable for its exercise of judgment in the absence of actual corruption. This arises from the necessity inherent in the transactions as well as the parties' agreement.

2. *Background.*

Harris County leases its domed stadium to Astrodome USA, a private corporation, and the Dome uses it for its baseball team and subleases it for conventions, concerts, rodeos, tractor pulls, and other events.

The Oilers sublease it for football games. The stadium has been the home field of the Oilers under a sublease with the Dome and its predecessors since about 1968. The lease was last amended in 1988. Although the

Oilers originally were part of the American Football League, the team has played in the National Football League since 1970, and the leagues operated essentially the same before their merger. The Dome knows about the operation of professional sports leagues as landlord to the Oilers and as the owner of a professional baseball team in the American League.

### 3. *Controversy.*

In August 1995, the San Diego Chargers were to meet the Houston Oilers in the stadium in a pre-season football game. Under League rules, its referee is the official who has the authority to enforce the site standards as well as the playing rules.

On referee Ronald Blum's inspection of the field, he announced his conclusion that the field was unsuitable for play. In reaching his decision, the referee conferred with representatives of the Chargers and the Oilers. As the home team, the Oilers had the responsibility to furnish the field. The Oilers worked with the Dome to cure the deficiencies. The start of the game was delayed for seventy minutes, before it was canceled.

The Chargers returned to San Diego. In a flurry of press conferences, everyone opined about the blame for the cancellation. The League's commissioner described the stadium negatively. The theories about the game fell into three causes: the field was actually defective, the referee was inept, and the League had joined with the Oilers in a plan to hurt the Dome to improve the Oilers negotiating position against the Dome for new sublease terms.

At the next meeting of the League, it assessed the Oilers $325,331 for its failure to furnish a proper field under its League obligations. The Oilers paid the Chargers $440,000 for refunded ticket sales.

### 4. *Sub-Lease.*

The League membership requires that the home team furnish a suitable field. This obligation is absolute because neither the League nor the opposing teams are in a position to monitor effectively the conditions at stadiums. The sublease between the Oil-

ers and the Dome requires that the Dome furnish a "football field to be laid out and equipped in accordance with current NFL rules and regulations."

### 5. *Unique Cancellation.*

The Chargers–Oilers game is the first game to have been called for field condition other than for current weather-related problems. The Dome says that the uniqueness of this cancellation implies trickery. The Dome says that it is simply not credible that this field was worse than the field for any of the other 7,685 games played since World War Two. This event was not quite that rare.

The stadium rented by the Dome was the first indoor football stadium. There are now about six or seven indoor stadiums. Not all of them, however, have playing surfaces that are convertible from football turf to baseball turf to rodeo dirt to convention concrete. The problems identified by the umpire were connected to the reconfiguration of the artificial turf surface. Many open-air, natural-grass fields are converted from baseball to football, and many early season football games are played on fields with the grassless baselines present.

### 6. *Negligence.*

The Dome says that the League failed to use ordinary care in performing its duties as rule maker and enforcer, making it liable to the Dome for its losses from the cancellation.

#### A. *League Duty.*

The League has duties to its members, and except under an agreement, it incurs no obligation to third parties to the League by its conduct of its internal rules. The Dome agreed with the Oilers to meet the standards of the League in furnishing a field under its sublease to the Oilers. If the Dome met those standards and if the Oilers did not use the facility—costing the Dome its revenues from concessions and parking, for instance—its complaint is with the Oilers.

#### B. *No Precision.*

The Dome says that the League owed those who contract with its members a duty

to develop objective, precise standards for acceptable playing surfaces. The Dome says that for a nation-wide, multi-million dollar, seventy-five year-old enterprise to have no standard more precise than "well-maintained" is a confession of negligence.

■ With its belief in the ultimate objective calculability of life, the Dome is a candidate for a place on the United States Sentencing Commission. The legal standard for a ship from steamship *Claremont* to nuclear ship *Savannah* is that she be seaworthy. No decimal points, no matrix, just "seaworthy." *The Caledonia*, 157 U.S. 124, 15 S.Ct. 537, 39 L.Ed. 644 (1895).

■ Building contracts have books of design and material specifications, but whether a contractor has complied is a decision confided to the architect's judgment. *See Morse/Diesel Inc. v. Trinity Industries Inc.*, 67 F.3d 435 (2nd Cir.1995); *RaDec Constr. Inc. v. School Dist. No. 17 of Douglas County*, 248 Neb. 338, 535 N.W.2d 408 (1995). Shipowners are entitled to rely on the judgment of marine surveyors and rating agencies—like the American Bureau of Shipping—that the vessel is seaworthy. *See generally Savannah Ship Repair Comp. v. Hellenic Lines Limited et al.*, 305 F.Supp. 438 (S.D.Ga.1969).

In sports, some standards like blood tests for illegal drugs are objective, but for every objective one there are hundreds that require a judgment. *See e.g, White v. Turfway Park Racing Ass'n, Inc.*, 718 F.Supp. 615 (E.D.Ky.1989), *aff'd*, 909 F.2d 941 (6th Cir. 1990). Some decisions are suitable for an internal review, like furnishing an opportunity to be heard before expelling a member or a second hearing on the accuracy of a bloodline determination. *See generally, Hatley v. American Quarter Horse Ass'n*, 552 F.2d 646 (5th Cir.1977).

### C. *Deliberations.*

■ The Dome complains that it was not included in the deliberations among the League and two teams. The Dome was not included in the conference when the umpire made his decision, but the Dome had been extensively consulted about the field, its con-

dition, time required to change it, and other topics. The League had no duty to deliberate with the landlord. The League was obliged to its members—absent teams as well as the Chargers and Oilers—to make an informed decision, but it had no obligation to negotiate with the landlord.

### 7. *Secondary Contract Claims.*

■ The Dome is not a third-party beneficiary of the agreements between the League and its members. The standard for the field is not for the Dome's benefit; it is for the League's benefit. The League has no interest in nor duty to people who furnish goods, services, and land to its members. If the League's acts were likely to jeopardize the Dome's economic expectations of the stadium-lease deal, it has been free to negotiate for additional security from the League or the Oilers. *Citizens Nat. Bank in Abilene v. Texas & P. Ry. Co.*, 136 Tex. 333, 150 S.W.2d 1003 (1941); *Danciger Oil & Refining Co. of Texas v. Powell*, 137 Tex. 484, 154 S.W.2d 632 (1941) (no implied covenant to do more); *Banker v. Breaux*, 133 Tex. 183, 128 S.W.2d 23, 24 (1939, judgm't adopted) ("[t]he law is well established that a third person may sue to enforce a contractual provision made for his benefit, but ... the contracting parties [must have] intended to make same for his benefit"). *See also Suthers, M.D. v. Booker Hosp. Dist.*, 543 S.W.2d 723 (Tex.Civ. App—Amarillo 1976, writ ref'd n.r.e.).

### A. *Inspection Timing.*

League regulations require inspection of game surfaces four to six hours before a game. The League made its inspection on time. The Dome relies on regulations requiring an inspection twenty-four hours before the game, but that rule was superseded in 1988.

The Chargers objected to the field at practice around 2:00 p.m. Saturday. The facts suggest that the Dome did not have people at the site who were responsible officers the day before the game. Apparently, one could have been paged. The problem of having some one available to correct the problems persisted the next afternoon. The sublease requires the

Dome to have the field ready four hours before game time.

### B. *Inspection Competence.*

■ The Dome complains about the quality of the referee's inspection. The only evidence of "incompetence" are two circumstances. First, since this was the only game to be canceled for field preparation, it must have been the inspection. Second, because the cancellation came in the middle of acrimonious negotiations between the Oilers and the Dome, it must have had an ulterior purpose of helping the Oilers rather than the proper goal of player safety.

The facts do not raise an issue about the quality of the referee's performance. The first cancellation was bound to occur. Without suggesting fault, it would be hard to find a time in the last thirty-five years without acrimony between the prime tenant and subtenant. Blum knew his job.

### 8. *Standards, Discretion & Liability.*

Private associational institutions are created to serve a variety of interests. Some of them exist to furnish standards for others, like Underwriters Laboratories which was founded to supply boiler inspections for the insurance industry after the *Sultana* disaster. Some of them exist to furnish facilities for others, like a stock exchange. Some of them are entrepreneurial, some are eleemosynary, and some are mixed.

Contrary to the assertions in some opinions, courts are not less able to decide whether a playing surface is well-maintained or whether a particular horse should have been allowed to run in a race. Courts capably handle matters much more difficult than game films and urinalysis reports. Two related concerns of prudence suggest that we not engage in officiating as well as judging. Courts cannot respond in time to preserve the progress of the season much less the game. The transaction costs of using the courts, including the cost of delay, would impoverish any association.

■ The principal reason courts ought not to intrude into the internal operations of consensual associations is that the partici-

pants have agreed to abide by their own informal mechanism for resolving disputes. The Dome agreed to abide by the NFL standards and officiating through its lease with the Oilers. In the absence of an historic written agreement, the internal processes are known by third-party contractors with participants in Leagues.

■ Occasions will arise when courts cannot accede to the results of private arrangements. If the process is corrupt, courts are obliged to intrude between the direct participants, but that would not necessarily apply to secondary levels of reliance. If the New York Stock Exchange's management took a bribe to close trading for a day to stop a run on a stock, the *Wall Street Journal* could not sue the exchange for its loss of readership because of no trading.

■ The usual formulation by courts that the private process will be left to function unless there is evidence of "bad faith or fraud" simply means that when a decision is patently bizarre, courts tend to look for subversion of the normal reasonable functioning of the group. *Screwmen's Ben. Ass'n v. Benson,* 76 Tex. 552, 13 S.W. 379, 380 (1890) (the "decisions of these [associations], when organized under the constitution, and lawfully exercising these powers, though they involve the expulsion of a member, are no more subject to collateral attack for mere error than are the judgments of a court of law"); *Harden v. Colonial Country Club,* 634 S.W.2d 56 (Tex.App.—Fort Worth 1982) (courts will not interfere with the internal management of a voluntary association so long as its governing bodies do not substitute legislation for interpretation, and do not act totally unreasonably or contravene public policy); *Hoey v. San Antonio Real Estate Bd.,* 297 S.W.2d 214, 216 (Tex.App.—San Antonio 1956) (same).

### 9. *Harsh Application.*

■ The deliberate misapplication of existing standards could be motivated by something other than the best interests of the sport—however defined. The court assumes that games have been played on fields worse than this one; whether games have been

played with worse examples of these particular defects is a much harder question.

Fortunately, the legal question is: Is it manifestly arbitrary for a reasonable person to object to the playing conditions as they existed. The answer is that several apparently reasonable people objected, and the one person who had the responsibility for making the decision decided that he objected. An erroneous call of pass interference can cost a team the game and the stadium the opportunity for play-off games. Without evidence of the referee's corruption by lucre or malice, an error is an error.

### 10. *Business Disparagement.*

 The Dome has sued the League for disparaging the Dome's business through the League's express and implicit criticism of the stadium's condition. The cause of action is parallel to common law slander. Traditionally, it has six elements:

- Published. The defendant must have injured the plaintiff by a publication.
- Negative. The content of the publication must be reasonably susceptible to negative interpretation.
- False. The plaintiff must prove that the facts of the negative content were false.
- Malicious. The defendant must have acted deliberately to injure another.
- Unjustified. The offending conduct must be unrelated to the legitimate interests of the defendant's own operations.
- Special damages. The plaintiff must establish a direct, pecuniary loss that resulting from the publication. W. Keeton, *Prosser and Keeton on the Law of Torts,* § 128 at 971 (5th ed.1984). Restatement (Second) of Torts § 594, 598 (1977).

### 11. *Privilege of Justification.*

 The comments and acts by the League, including the commissioner's press-conference statements, were published in the legal sense. Assuming that they were negative, false, malicious, and damaging, the Dome's claim of unlawful disparagement of his business fails as a matter of law because they were privileged.

In the contexts of the game cancellation or of the franchise's moving to Nashville, the statements were directly connected on their face to the business of the League. Player safety, game delay, stadium capacity, and facility age are all directly related to the purposes of the League. *Frank B. Hall & Co., Inc. v. Buck,* 678 S.W.2d 612, 629 (Tex. App.—Houston [14th Dist.] 1984, writ ref'd n.r.e.).

To backtrack slightly, the malice that was assumed would have to be derived from the League's having known that its publications were false statements of fact about the Dome. Just as the Dome has complained that there is no articulable standard for "well maintained," there are no standards for objective truth of statements of evaluation like "inadequate," "obsolete," or "unfit."

The Dome sued the League for having slandered it by publishing these same statements, but that claim founders on the issue of privilege, too, without going through the problems created by the activity of the government and public figures, who implicate the freedom of expression. *Schauer v. Mem'l. Care Systems,* 856 S.W.2d 437, 450 (Tex.App.—Houston [1st Dist.] 1993) (no "clear and convincing" evidence of actual malice); *Houston v. Grocers Supply Co.,* 625 S.W.2d 798, 800 (Tex.App.—Houston [14th Dist.] 1981, no writ) (whether a communication has a qualified privilege is a question of law for the court).

 The Dome has asserted that the broad communication of the League's views about the field condition was an abuse of its privilege because the issue was not one affecting the public. The public interest in this controversy radiates from its context. The nature of the parties' business is public entertainment. They sell tickets to the ordinary person in the community, advertising, promotional rights to the images of the teams and stadium, and television broadcast. Of course, they both hold innumerable press conferences. The stadium is a county park; it was built and refurbished with county bond funds. The viability of the stadium for football may affect its suitability for the rodeo, which could affect the millions of dollars in scholarships raised by the rodeo.

### 12. *Fraud.*

■ The Dome says that the League defrauded it. The Dome supports its claim of fraud by maintaining that the bad things the League said about the stadium were facts rather than opinion.

The convoluted, inconsistent, and artificial jurisprudence that has developed in the fields of slander and fraud illustrates the wisdom of keeping the government out of determinations of the qualities of expression as best exemplified by the Constitution's ban on legislative evaluation of speech. Every opinion implies collateral facts. Even the opinion about a monetary value implies facts that would support that value. If an appraiser says a lot is worth $50,000 when everyone else has said it is worth $300,000, compels the inference that he knows something or, of course, that he is simply crazy.

An assertion that the field is "uneven" is objectively true. To some degree the field will always be uneven. Whether it is uneven to the extent that it is unsafe for the players is a judgment.

■ To work a fraud at law, an assertion must have been made as a statement of fact by someone who knows it not to be true with the intention that the person to whom it is addressed rely on it and the person must have reasonably relied on it in acting to his detriment. The Dome relied on no insult of the League's. If it had built a new stadium in response to the commissioner's characterization of the stadium as unfit, that reliance would have been unreasonable as a matter of law.

### 13. *Conspiracy.*

■ The Oilers and the League agreed; they acted in concert. The question is whether they combined to accomplish an illegal purpose. The Dome supposes that it was a conspiracy to help the Oilers battle the Dome contractually. The Oilers and the Dome have been at war over the sublease, stadium condition, and other matters for years, and the League has never interfered to help the Oilers illegally. The Dome has not articulated a rational plan that the conspirators might have been seeking to accom-

plish. Why exactly would the League have preferred to hurt the Chargers, Oilers, and itself as a strategy to get the Dome? People and institutions do self-defeating counterproductive things, but a court is not allowed to presume the answers that a claimant must prove. *Schlumberger Well Surveying Corp. v. Nortex Oil & Gas Corp.,* 435 S.W.2d 854 (Tex.1968); *Great Nat. Life Ins. Co. v. Chapa,* 377 S.W.2d 632, 635 (Tex.1964) ("collision was entirely collateral and incidental to the agreement entered into by these parties"). Assuming ill will, the Dome needed to identify an illegal object of the conspiracy. Canceling the game is not itself an end; it is a means.

### 14. *Tortious Interference.*

■ The League did not interfere with contracts of the Dome. The sublease between The Dome and the Oilers incorporates the League's standard as its standard, so the League is not a stranger to the contract. It did what it was fully expected to do in its independent discharge of its responsibilities as a League.

■ The Dome has a series of secondary contracts that are dependent on the Oilers sublease. The League did not interfere with them either. The League sold no Cokes ™, lured no hotdog vendor to cancel his concession. *See Texas Beef Cattle Co. v. Green,* 921 S.W.2d 203, 211 (Tex.1996); *Morris v. Jordan Financial Corp.,* 564 S.W.2d 180, 184 (Tex.Civ.App.—Tyler 1978, writ ref'd n.r.e.).; *CF & I Steel Corp. v. Pete Sublett & Co.,* 623 S.W.2d 709 (Tex.Civ.App.—Houston [1st Dist.] 1981, writ ref'd n.r.e.).

### 15. *Conclusion.*

In today's complex relations, a disruption in one transaction has adverse consequences for others, but the various participants do not have legal duties to ignore their individual direct interests for the sake of avoiding collateral losses to other participants. This should be obvious from the reverse, the League would have no claim to the Dome's increased profits resulting from its commissioner's praising the stadium or authorizing additional games.

The court is fully capable of running the League, stadium, and franchise, but it will not because the parties have consented to a private mechanism to decide the suitability of field conditions.

Astrodome USA will take nothing from the National Football League.