Bell, J.
This action grows out of a dispute between plaintiff in error and defendant in error, plaintiff and defendant respectively in the trial court, and hereinafter so referred to, over title to and right of possession of certain parts of lots 8, 9 and 10, block 103, in the East Division of the City .of Denver.
The principal claims, of the parties, to the property in controversy are based upon two different surveys and maps of the City of Denver, including the East Division thereof, : — one made by E. D. Boyd on or about August 8th, 1859, *472 upon which plaintiff relies, and the other made by F. J. Ebert on or about June 24th, 1865, upon which defendant relies.
It is admitted that in the year 1859 section 33 and the west one-half of section 34 in Township 3 south of Range 68 west of the 6th P. M., was public domain, and that the same was settled upon and occupied as a townsite, and was known and designated as the City Of Denver. In the year last above mentioned, and before the incorporation of the City of Denver, the Boyd survey and map were made, which located, marked and numbered the lots and blocks, and fixed, located and named the streets and alleys of said townsite. On or about November 7th, 1861, the City of Denver was duly incorporated as a municipal corporation, under and by virtue of a special act.of the legislature of the then territory of Colorado; and on May 6th, 1865, under and by virtue of the terms and conditions of acts of congress approved respectively May 23rd, 1844, and May 28th, 1864, one James Hall, then Probate Judge of the County of Arapahoe in the territory of Colorado, duly entered, in the United States District Land Office, the lands so settled upon and occupied as a townsite, in trust for the use and benefit of the occupants thereof, as townsite settlers, according to their respective interests therein. On or about June 24th, 1865, one F. J. Ebert, under the direction of the city council of the City of Denver, made a survey and map of said townsite of the City of Denver, which said survey and map were filed in the office of the Recorder of Arapahoe County, Territory of Colorado, on or about' June 29th, 1865. The Boyd survey and map had never been filed in the office of the City Clerk of the City of Denver, nor recorded in the office of the County Clerk and Recorder of Deeds of Arapahoe County, Territory of Colorado, until February 26th, 1876, when by authority of a resolution of the city council of said City of Denver, passed February 24th, 187.6, they were so recorded. No official recognition by the City of Denver is shown to *473 have ever been given to the Boyd survey and map, except such as is expressed in said resolution, which expressly states that said survey and map be recorded for the better preservation of the same, and • the reasons given therefor are that said survey and map had not been recorded, and that a majority of deeds conveying property in said East Division of the City of Denver had been made in accordance therewith; but no expression is contained in said resolution tending to show any intention of the city council to substitute the Boyd for the Ebert survey and map, or to make the former an official survey and map. The Boyd survey and map and the Ebert survey and map were in conflict with and differed from each other in that large portions of lots 8, 9 and 10 of block 103, as surveyed and-platted by Boyd, were taken from said lots 8, 9 and 10 and surveyed and platted by Ebert as a part of the bed of Cherry Creek. In July 17th, 1865, one Ben Holliday, as provided by the act of the legislative assembly of the Territory of Colorado, providing for the disposition of lots in said Denver townsite, approved March lith, 1864, duly filed with the Probate Judge of said Arapahoe County his claim to said lots 9 and 10 in block 103, East Denver, and thereafter, on August 11th, 1865, 43 days after Ebert survey and map had been filed for record in the office of the Recorder of Arapahoe County, Territory of Colorado, and over 10years before the Boyd survey and map were so filed and recorded,-James Hall, then Probate Judge of Arapahoe County aforesaid, duly conveyed said lots 9 and 10 to said Ben Holliday, by deed duly recorded, without making any reference therein to any particular survey or map; and on October 29th, 1872, Henry A. Clough, the then Probate Judge of Arapahoe County aforesaid, and successor in trust to said James Hall, likewise conveyed to James M. Strickler “all that portion or part of said lot eight (8) block one hundred and three (103), East Denver, as lies without the bed of Cherry Creek, according to the map and survey of F. J. Ebert.” By virtue *474 of these deeds and divers and sundry mesne conveyances, plaintiff primarily claims title to said lots 8, 9 and 10, as the same are marked and defined on the Boyd survey and map, and also by virtue of the statutes of limitations. The trial court, sitting without a jury, found the issues joined for the defendant, and rendered judgment accordingly.
The principal question presented on review is whether the plaintiff showed bya preponderance of the evidence that the lots in controversy were conveyed according to the Boyd survey and map. This burden was upon her, and in support of the finding of the trial court that she failed in this respect, the deeds, themselves, for said lots, and the facts and circumstances attending their execution must be considered in order to determine the intention of the parties therein.
As to lot 8-, the deed, itself, expressly recites that said lot was conveyed “according to the map and survey of F. J. Ebert,” which recital, under the circumstances of the record before us, necessarily controls; and as to lots 9 and 10, in addition to what has herein already been said regarding the conditions existing at and about the time of the execution of the deed thereto from which plaintiff, deraigns title, we are at liberty, as was said in City of Denver v. Pearce, 13 Colo., 383, 385, 22 Pac., 774, 6 L. R. A., 541, to consider the history of the title to the premises, and a construction of the conveyance under which the plaintiff claims, not only from the evidence, and deeds of conveyance, set forth in the record, but also from the statutes' and laws relating to town-sites which were in force at the time the deed was executed and delivered.
In the case above cited, at page 388, it is said:
“To acquire control of the bed of Cherry Creek,' as defined by the Ebert Survey, had long been the settled policy of the municipal authorities. This policy is clearly disclosed by the record, and by the statutes which were in force at the time this sale was had. By an act approved' February 10, *475 1865, (Colorado Legislature), the city was authorized to ‘define and fix the boundaries of the channel of Cherry Creek within the corporate limits of the city; to remove obr structions therefrom; and to prevent persons from obstructing the same.’ Pursuant to this act, and o.n June 22, 1865, by formal resolution, the plat of the city made by F. J. Ebert was approved and ordered to be filed for record in the office of the recorder of Arapahoe County. By an ordinance thereafter enacted the channel of the bed of Cherry Creek, within the corporate limits, was declared to be a public place; and it was further declared to be ‘unlawful to place any wall, building, fence, dike, earth, manure, garbage or other obstruction in or upon the same.’ By an act of the legislature approved February 9, 1872, it was provided that ‘the said city council shall have power and authority to condemn, and appropriate in fee to the use of the city, the strip of land within the bed of Cherry Creek, as defined by the city council. * * *’ Sess. Laws, 1872, p. 207. In the light of the statutes, resolution and ordinances cited, it is clear that appellant intended to purchase the bed of Cherry Creek for the benefit of the public. It is equally clear that it was the intention of the trustee, at the time the sale was made, to convey to the city all of the bed of the stream, title to which remained in him. It follows that the trustee must have intended to convey to appellee’s grantor a parcel of land bounded, not by the thread of the stream, but by the bank, as defined by the Ebert survey.”
The Probate Judges were trustees for the use and benefit of the occupants of the land entered, with power and authority to pass upon the .proofs of their occupancy of the land at the date of entry. Therefore, Probate Judge Hall, grantor in the deed now under consideration, and who was also County Judge at the date thereof, had constructive notice, at least, that the Ebert survey and map was the only survey and map of the Denver Townsite filed or of record in the recorder’s office of the County of Arapahoe, Territory *476 of Colorado, at the time the deed was made, and he must have been cognizant, from the statutes, ordinances and resolutions in existence at the time, of the efforts and purposes of the city authorities and the people of the territory to have the bed of Cherry Creek controlled by the city for the benefit and protection of the public, and it is reasonable to conclude that he was influenced by this knowledge in making the deed to the lots in question, and in passing upon the proofs of occupancy submitted by the parties thereto.
In the evidence, it appears from the testimony of plaintiff’s husband and other witnesses that in 1879, the premises in dispute were on a level with Cherry Creek; that in 1882, the city drove a line of piling angle-wise with the creek, about 15 feet from the present retaining walls, to confine the floods; that this piling stood about 6 or 7 feet above the ground, and was later reinforced by a slag wall; that the premises were not fenced nor in use below the piling or slag wall; that they were not permanently improved; and were used only for storage purposes for building material and the like.
Further, it is stipulated that, in plaintiff’s chain of title to lot 10 from the government to herself, there appears a conveyance from Richard E. Whitsitt to Ira C. Grant dated June 26th, 1877, in which said lot is described as lot 10, block 103, East Division of Denver, “as per map of F. J. Ebert.” According to this description, the deed does not purport to convey any part of said lot other than is marked and defined by the Ebert survey and map, and being prior to the transfer of said lot to plaintiff, we are unable to see wherein any deed subsequent thereto could enlarge the grant as therein contained.
It is a matter of common knowledge that Cherry Creek is and has been a torrential stream, most difficult and expensive to confine in any ordinary channel, and frequent floods, prior to the city’s building of the present retaining walls, spread over much of the city, and did much damage *477 to streets, alleys and private property. The duties have been imperative upon the city from the inception of the entry of this townsite to build expensive barriers and retaining walls to prevent the destruction of that part of said lots 8, 9 and 10 not in the bed of the creek, as well as for the protection of other property, and at this late day, the courts should not disturb the public plans or purposes in controlling this creek, unless some clear, legal or equitable right is established by a preponderance of the evidence.
Under the finding of the trial court of the issues in favor of defendant, and the chief issue between the parties being whether the court should be governed by the description of the bed of Cherry Creek as made by the Boyd or the . Ebert survey, it would seem that the trial court did not find that plaintiff had established her chief contention that the Boyd survey should control; and failing in this, the record then does not contain the material facts upon which plaintiff must base her claim to title and possession by virtue of the statutes of limitations, even if the provisions of said statutes do operate against a muncipal corporation, upon which question we need not and do not pass.
But it is contended by plaintiff that, if Holliday, from whom she deraigns title to lots 9 and 10 by mesne conveyances, obtained his deed from Probate Judge Hall according to the Ebert survey, then she is the owner of the adjoining bed of Cherry Creek to the centre or thread of the stream, according to the Ebert survey; and further, that if she is to be controlled in her claims by the Ebert survey, she is entitled to the accretions produced by the change in the stream by reason of floods, or otherwise, — or, in other words, that she is entitled to such portion of the bed of Cherry Creek as has been reclaimed, either by natural or artificial means, for the reason that, being a riparian owner, she is entitled to the same length of shore line upon the changed or new bank of the stream as she had originally upon the former or old bank.
*478 If these contentions have any merit, they must be supported entirely by the deeds to lots 9 and 3.0 from Probate Judge Hall to Holliday, for no such rights can arise from the deed for lot 8 from Probate Judge Clough to Strickler, since the grantor therein, on the same- day, by a deed to the City of Denver, conveyed to said city, for a consideration of $5,050, “the whole of the bed of Cherry Creek as the same is marked and defined on the map of said city as per survey of F. J. Ebert from the point where the same intersects the south line of the old bed of the South Platte River to the point where the same intersects the south line of said section thirty-three (33) save and except such parts and portions thereof as may have been heretofore deeded by any Probate Judge since the entry of said land in trust as aforesaid.” Under the authority of City of Denver v. Pearce, supra, these two deeds, — one for lot 8, and the other for the bed of the creek, — having been executed the same day, show an intention to separate the ownership of the bed of the stream from the ownership of the lot, and overcomes the presumption that • might otherwise be indulged that a deed to a lot bounded on an unnavigable stream carries the title to the bed of the stream to its center.
Therefore, the rights of the plaintiff thus contended for must be controlled by a construction of the Holliday, deed in accordance with the facts and circumstances attending its execution, so as to learn the intention of the parties thereto. It was the province of the trial court to determine this intention from the attending circumstances and evidence detailed at the trial, and to ascertain whether it was the purpose to convey to the grantee in the deed any riparian fights, or to reserve to the City of Denver all of the bed of the creek in pursuance of the purposes of the legislature expressed in the act of February 10th, 1865, and the resolution and ordinance of the city council passed in conformity thereto ; and from the general finding in favor of the defendant, we must infer that the trial court found this issue for the *479 defendant; and from the facts and circumstances hereinbefore reviewed, including the conduct of the parties benefited by the conveyance, there seems to be sufficient evidence to support the finding. The proprietors of lands bounded on water courses may limit their conveyances thereof within specific limits, and if anything appears which indicates an intention on the part of the proprietors to make such a limitation, and to reserve to themselves any rights in front of the water lots, after they have been sold, such an intention will prevail over any presumption that such conveyances carry title to the bed of the stream to its center: Watson v. Peters, 26 Mich., 208; City of Denver v. Pearce, 13 Colo., 388, 22 Pac. 774.
It is also argued that plaintiff acquired title to the property in dispute by reason of certain tax sales, and that the city is now estopped from claiming any part of the land, as against her rights, by reason of its conduct in placing ■said lots upon its block-books and assessing them as full lots of 25x125 feet for taxes and special improvements, and in receiving and collecting such taxes and assessments from plaintiff and her mesne grantors.
To this contention it may be said that it is settled that the levy and collection of taxes on property by the assessors and tax officers of a city will not estop the city from asserting title to the property for the benefit of the public Board of Park Commissioners v. Taylor, 133 Iowa, 453, 108 N. W., 927, 931; City of Seattle v. Hinkley, et al., 67 Wash., 273, 121 Pac., 444, 446.
Under the state of the record before us, we are not able to say that the trial court committed error in holding that the plaintif had not established the material allegations of her complaint by a preponderance of the evidence, as she was required to do; and, therefore, the judgment of the trial court is hereby affirmed.

Affirmed.

*480 Decided July 14, A. D. 1915.
Rehearing denied July 26th, A. D. 1915.