**Robert B. LANE, d/b/a Lane Realty Company, Plaintiff,**

v.

**Ronald J. URGITUS, Richard M. Calhoun, and CB Richard Ellis, Inc., Defendants.**

**No. 06SA49.**

Supreme Court of Colorado, En Banc.

Oct. 23, 2006.

Frascona, Joiner, Goodman and Greenstein, P.C. Matthew B. Osofsky, G. Roger Bock, Oliver E. Frascona, Boulder, Colorado, Attorneys for Plaintiff.

Silver & Deboskey, P.C. Joe L. Silver, Martin D. Beier, Denver, Colorado, Attorneys for Defendants.

Rothgerber Johnson & Lyons LLP, Richard K. Clark, Craig R. Welling Denver, Colorado, Attorneys for Amici Curiae National Association of REALTORS® and Colorado Association of REALTORS®.

Justice HOBBS delivered the Opinion of the Court.

This case involves a dispute over real estate transaction referral fees among Colorado licensed real estate brokers who were members of the Denver Metropolitan Commercial Association of REALTORS® ("DMCAR") when the transactions and disputes in this case arose.[1] An express condition of membership is that members will submit such disputes to binding arbitration. Each of the brokers separately executed an application form for membership that included consent to arbitration in accordance with the requirements of interconnected local and national REALTOR® professional organizations.

The complaint alleges the existence of a referral fee agreement among the licensed Colorado real estate brokers, who are parties to this case.[2] The district court entered an

---

1. "REALTOR®" is a federally registered collective membership mark used by the National Association of REALTORS® and its constituent state and local associations of REALTORS® to indicate their membership status. Individuals who are members of these associations are called REALTORS®. It appears from the record that the Denver Board of REALTORS®, which Cal-

houn first joined, is now a part of DMCAR, which Urgitus joined.

2. Whether the parties entered into the alleged referral fee agreement is a factual matter for the arbitration. Under Colorado's arbitration act, the arbitrator determines whether a condition precedent to arbitrability has been fulfilled and

order for binding arbitration pursuant to section 13–22–207, C.R.S. (2005), of Colorado's Uniform Arbitration Act. In bringing this original proceeding under C.A.R. 21, the defendant brokers assert that no arbitration agreement existed because (1) the parties did not execute an arbitration agreement with each other, (2) membership in a voluntary association does not create a contract among members of that organization, and (3) even if there was an agreement to arbitrate, it ceased to exist when the defendant brokers withdrew their membership from DMCAR.[3]

We affirm the district court's arbitration order. We hold that the district court did not err in ordering arbitration because (1) each of these licensed real estate brokers had previously consented to arbitration with other members of the professional organization should disputes arise among themselves; (2) each of these brokers were members of the organization when they entered into the alleged referral fee agreement and the disputes arose; and (3) their consents to arbitrate constituted an implied condition of the alleged referral fee agreement enforceable under Colorado's Uniform Arbitration Act, sections 13–22–201 to –239, C.R.S. (2006).

Our holding and reasoning in this case are limited to the circumstance of an agreement among the parties to the lawsuit that includes an implied condition to arbitrate. We do not decide or address whether by-laws of a voluntary association are enforceable against and among individuals absent a contractual relationship that would include an implied condition as exists in this case.

Because the district court should have stayed the lawsuit pending arbitration pursuant to section 13–22–207(7), rather than dismissing it, we set aside the district court's order of dismissal, and order the lawsuit stayed pending arbitration.

whether a contract containing a valid agreement to arbitrate is enforceable. § 13–22–206(3), C.R.S. (2006).

3. The petitioners phrase their issues as follows:
1. Whether, in the absence of a written agreement between them to arbitrate, parties can be compelled to arbitrate because they belong or formerly belonged to a professional organiza-

## I.

Plaintiff Robert Lane, d/b/a Lane Realty Company, ("Lane") is a licensed Colorado real estate broker and employing broker at Lane Realty Company. He served as chief financial officer for Weberg Enterprises, Incorporated from 1985 until 2002, when the company closed, and as property manager for Weberg Properties, the real estate arm of John Weberg's property. In 2002 John Weberg solicited Lane's advice regarding realtors who could assist Weberg in disposing of his real estate portfolio. Lane alleges that he contacted several realtors and, on July 22, 2002, he entered into a "referral fee agreement" with CB Richard Ellis, Incorporated ("CBRE") for "a referral of 20% on any deals going forward with John P. Weberg."

The complaint alleges the following. In February 2004, after the sale of one of Weberg's properties, Fairways Plaza Shopping Center, CBRE paid Lane approximately $52,000 as a referral fee. When a second Weberg property sold in 2004, the County Line property, Ronald Urgitus, the employing broker of CBRE, refused payment of the referral fee. Lane learned of a listing with CBRE for the sale of a third Weberg property, Denver Distribution Center. Lane contacted Richard Calhoun, managing broker at CBRE, regarding the status of his referral fees for the two listings for which he had received no fee. Calhoun refused payment.

On January 21, 2005, pursuant to the procedures of the Denver Board of REALTORS®, Lane submitted a Request and Agreement to Arbitrate form to DMCAR. The DMCAR sent a notice of the arbitration request to Urgitus and Calhoun on February 8, 2005, and requested a response by February 23, 2005.[4] Urgitus and Calhoun did not respond, and they withdrew

tion with bylaws that require its members to arbitrate.
2. Whether the trial court exceeded its authority and abused its discretion in declining to certify its decision for appeal.

4. Only individuals licensed as real estate brokers are eligible to apply for membership in the local REALTOR® association.

their membership in DMCAR on May 9, 2005.

In his suit filed in July 2005 to collect the fees allegedly owed to him, Lane sought an arbitration order. The brokers involved on both sides of this action are Colorado licensed real estate brokers. Urgitus filed an application for membership with DMCAR, was accepted, and was a member of this association when the disputes for which the court ordered arbitration arose. Calhoun filed an application for membership with DMCAR, was accepted, and was a member of this association when the disputes for which the court ordered arbitration arose.[5]

The application for membership Urgitus signed for DMCAR contained the following provisions:

> In the event my application is approved, I agree as a condition of membership to complete the orientation and ethics course of DMCAR; and to otherwise on my own initiative thoroughly familiarize myself with the *Code of Ethics* of the National Association of REALTORS®, *including the duty to arbitrate business disputes in accordance with the Code of Ethics and Arbitration Manual of the Board and the Constitutions, Bylaws, and Rules and Regulations of DMCAR, the Colorado Association and the National Association.* I further agree to satisfactorily complete a reasonable and non-discriminatory written examination covering such Code, Constitutions, Bylaws, Rules and Regulations, and *duty to arbitrate.* I further agree that my act of paying dues shall evidence my initial and continuing commitment to abide by the aforementioned Code of Ethics, Constitutions, Bylaws, Rules and Regulations, and *duty to arbitrate,* all as from time to time amended.

(Emphasis added). The application form Calhoun signed for DMCAR contained provisions equivalent to those Urgitus signed. Incorporated by reference in the signed applications, the Code of Ethics, Arbitration Manual, and Standards of Practice of the National Association of REALTORS® provides in "Part Two—Membership Duties and Their Enforcement" that:

> The duties of membership include the following: (a) to abide by the Code of Ethics of the National Association of REALTORS®; (b) to abide by the bylaws of this Board and its rules and regulations; and (c) to submit to arbitration all disputes specified in Part ten of this Manual by the procedure therein provided, and to abide by the arbitrators' award....

"Part Ten—Arbitration of Disputes," in turn, provides that "[t]he obligation to participate in arbitration contemplated by this Article includes the obligation of REALTORS® (principles) to cause their firms to arbitrate and be bound by any award." The matters that must be arbitrated include "entitlement to commissions and compensation in cooperative transactions that arise out of the business relationships between REALTORS® and between REALTORS® and their clients and customers...." Article 17 of the Standards of Practice of the National Association of REALTORS® provides:

> In the event of contractual disputes ... between REALTORS® (principals) associated with different firms, arising out of their relationship as REALTORS®, the REALTORS® shall submit the dispute to arbitration in accordance with the regulations of their Board or Boards rather than litigate the matter.

"Article VI—Privileges and Obligations," section 5(a), of the DMCAR Bylaws provides that "if a member resigns or otherwise causes membership to terminate, the duty to submit to arbitration continues in effect even after membership lapses or is terminated, provided that the dispute arose while the former member was a REALTOR®."

On February 8, 2005, DMCAR notified Urgitus and Calhoun of Lane's request to arbitrate and sent them a form to sign relating to the arbitration. They did not sign and

---

**5.** Amici Curiae National Association of REALTORS® and Colorado Association of REALTORS® inform us that 25,000 REALTOR® members reside and work in Colorado; that the national organization first adopted the Code of Ethics and Arbitration Manual in 1973; and that arbitrations are conducted pursuant to detailed procedures before a panel of neutral real estate professionals trained to conduct such arbitrations.

return the form.[6] Three months thereafter they withdrew from membership in the REALTOR® organizations. The transactions and disputes for which Lane alleges that compensation is due from Urgitus and Calhoun arose before they terminated their membership.

Pursuant to section 13–22–207, C.R.S. (2006), the district court ordered Urgitus to "submit the matters described in [Lane's] complaint to binding arbitration pursuant to the rules of [DMCAR]," and placed the case "under stay pending the outcome of the arbitration and until such time as the parties request that the determination of the arbitrators be reduced to a judgment of this Court." Thereafter, the district court amended its prior order nunc pro tunc, as follows:

(1) the title of the Order shall read "Order Granting Plaintiff's Motion to Compel Arbitration;" and (2) Plaintiff's claim to compel arbitration is granted and the remaining claims of the Amended Complaint are dismissed, without prejudice.

Urgitus sought certification of the district court's order for appeal, pursuant to C.R.C.P. 54(b). The district court denied the motion for certification and required that the "parties shall cooperate in the immediate scheduling of arbitration."

## II.

We hold that the district court did not err in ordering arbitration because (1) each of these licensed real estate brokers had previously consented to arbitration with other members of the professional organization should disputes arise among themselves; (2) each of these brokers were members of the organization when they entered into the alleged referral fee agreement and the disputes arose; and (3) their consents to arbitrate constituted an implied condition of the alleged referral fee agreement enforceable under Colorado's Uniform Arbitration Act, sections 13–22–201 to –239, C.R.S. (2006).

### A. Standard of Review

Whether an agreement to arbitrate exists is a matter of law that we review de novo. *Allen v. Pacheco,* 71 P.3d 375, 378 (Colo.2003); *see also Parker v. Ctr. for Creative Leadership,* 15 P.3d 297, 298 (Colo.App. 2000) ("The question of arbitrability is one for the court to decide."). In determining whether the parties have agreed to submit the issue in question to arbitration, we follow state law principles governing contract formation. *Allen,* 71 P.3d at 378; *City & County of Denver v. Dist. Court,* 939 P.2d 1353, 1361 (Colo.1997).

We must construe the terms of the arbitration agreement in a manner that allows each party to receive the benefit of the bargain, and the scope of the agreement must faithfully reflect the reasonable expectations of the parties. *Allen,* 71 P.3d at 378. We must interpret the arbitration agreement in a manner that best effectuates the intent of the parties. *Id.*

To determine the scope of an arbitration agreement, we must examine the wording in order to ascertain and give effect to the mutual intent of the parties as well as the subject matter and purposes to be accomplished by the agreement. *In re Marriage of Popack,* 998 P.2d 464, 467 (Colo.App.2000). We ascertain the parties' intent by looking to the plain language of the arbitration agreement. *Allen,* 71 P.3d at 378; *see also State Farm Mut. Auto. Ins. Co. v. Stein,* 940 P.2d 384, 387 (Colo.1997) (addressing insurance policies generally).

We will enforce the agreement as written unless there is an ambiguity in the language; courts should neither rewrite the agreement nor limit its effect by a strained construction. *Allen,* 71 P.3d at 378. Thus, like any contract, an arbitration agreement must be given effect according to the plain and ordinary meaning of its terms. *Id.*

---

6. Urgitus and Calhoun contend that the form accompanying the notice of arbitration request constitutes an admission that the duty to arbitrate involving REALTOR® members does not arise unless the member signs this form. However, the application forms Urgitus and Calhoun signed, and the incorporated documents in the record of this original proceeding, plainly impose a duty of arbitration even if a member does not sign and return the form when requested to do so.

In determining whether an ambiguity exists, we must ask whether the disputed provision is reasonably susceptible on its face to more than one interpretation. *Id.* We also evaluate the arbitration agreement as a whole and construe the language in harmony with the plain and generally accepted meaning of the words employed, unless the intent of the parties demonstrates that an alternative interpretation is intended. *Id.*

If ambiguities are found in the arbitration agreement, we afford the parties a presumption in favor of arbitration and resolve doubts about the scope of the arbitration clause in favor of arbitration. *Id.; see City & County of Denver,* 939 P.2d at 1364.

## B. Arbitration Agreements Are Favored in Colorado

In Colorado, arbitration is a favored method of dispute resolution. *Peterman v. State Farm Mut. Auto. Ins. Co.,* 961 P.2d 487, 493 (Colo.1998); *see Wales v. State Farm Mut. Auto. Ins. Co.,* 38 Colo.App. 360, 363, 559 P.2d 255, 256 (1976). Our constitution, our statutes, and our case law all support agreements to arbitrate disputes. Colo. Const. art. XVIII, § 3; §§ 13–22–201 to – 239, C.R.S. (2006); *Peterman v. State Farm Mut. Auto. Ins. Co.,* 961 P.2d at 493.

Article XVIII, section 3 of the Colorado Constitution provides:

It shall be the duty of the general assembly to pass such laws as may be necessary and proper to decide differences by arbitrators, to be appointed by mutual agreement of the parties to any controversy who may choose that mode of adjustment. The powers and duties of such arbitrators shall be prescribed by law.

Pursuant to this provision, the General Assembly's enactment of the Uniform Arbitration Act, sections 13–22–201 to –239, provides a uniform statutory framework for arbitration in order to encourage the settlement of disputes.[7] *In re Marriage of Popack,* 998 P.2d at 467 ("All doubts whether a dispute is arbitrable are to be resolved in favor of arbitration."); *Farmers Ins. Exch. v. Taylor,* 45 P.3d 759, 761 (Colo.App.2001).

Colorado's arbitration act explicitly authorizes a cause of action to compel arbitration when a party alleges an enforceable agreement to arbitrate and another person's refusal to arbitrate pursuant to the agreement.

(1) On the motion of a person showing an agreement to arbitrate and alleging another person's refusal to arbitrate pursuant to the agreement:

(a) If the refusing party does not appear or does not oppose the motion, the court shall order the parties to arbitrate; and

(b) If the refusing party opposes the motion, the court shall proceed summarily to decide the issue and order the parties to arbitrate unless it finds that there is no enforceable agreement to arbitrate.

(2) On the motion of a person alleging that an arbitration proceeding has been initiated or threatened but that there is not an agreement to arbitrate, the court shall proceed summarily to decide the issue. If the court finds that there is an enforceable agreement to arbitrate, it shall order the parties to arbitrate.

§ 13–22–207, C.R.S. (2006).

Colorado's arbitration act provides for a division of duties between arbitrators and the court:

(1) An agreement contained in a record to submit to arbitration any existing or subsequent controversy arising between the parties to the agreement is valid, enforceable, and irrevocable except on a ground that exists at law or in equity for the revocation of a contract.

(2) The court shall decide whether an agreement to arbitrate exists or a contro-

---

7. Title 13, part 2, Uniform Arbitration Act was originally enacted in 1975. In 2004, the substantive provisions were repealed and reenacted, causing some addition, relocation, and elimination of sections as well as subject matter. Section 13–22–203(2), C.R.S. (2004), provides that "part 2 shall govern an agreement to arbitrate made before August 4, 2004, if all parties to the agreement or to the arbitration proceeding so agreed in a record." Since the agreement to arbitrate in this case was made prior to August 4, 2004, and no revisions were made to the Act in 2006, we cite to part 2 Uniform Arbitration Act, C.R.S. (2006).

versy is subject to an agreement to arbitrate.

(3) An arbitrator shall decide whether a condition precedent to arbitrability has been fulfilled and whether a contract containing a valid agreement to arbitrate is enforceable.

(4) If a party to a judicial proceeding challenges the existence of, or claims that a controversy is not subject to, an agreement to arbitrate, the arbitration proceeding may continue pending final resolution of the issue by the court, unless the court otherwise orders.

§ 13–22–206, C.R.S. (2006).

■ In *Howsam v. Dean Witter Reynolds, Inc.,* the United States Supreme Court restated the basic principles governing arbitration:

This Court has determined that "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." Although the Court has also long recognized and enforced a "liberal federal policy favoring arbitration agreements," it has made clear that there is an exception to this policy: The question of whether the parties have submitted a particular dispute to arbitration, *i.e.* the *"question of arbitrability,"* is "an issue for judicial determination [u]nless the parties clearly and unmistakably provide otherwise."

537 U.S. 79, 83, 123 S.Ct. 588, 154 L.Ed.2d 491 (2002) (internal citations omitted).

■ Under Colorado's arbitration act, a valid, enforceable arbitration provision divests trial courts of jurisdiction over all questions that are to be submitted to arbitration, pending the conclusion of arbitration. *Hughley v. Rocky Mountain Health Maint. Org., Inc.,* 927 P.2d 1325, 1330 (Colo.1996). Thus, a trial court order granting a motion to stay the proceedings and to compel arbitration is an "interlocutory order" that is not immediately appealable. *See Fonden v. U.S. Home Corp.,* 85 P.3d 600, 603 (Colo.App.2003) (citing the United States Supreme Court decision in *Green Tree Fin. Corp.–Ala. v. Randolph,* 531 U.S. 79, 86, 121 S.Ct. 513, 148 L.Ed.2d 373 (2000), (specifically noting "that

if the district court had entered a stay instead of a dismissal, that order would not be appealable") (internal quotations omitted) ).

### C. An Agreement to Arbitrate Exists in this Case

■ Under Colorado law, contractual conditions may be express or implied. *E.g., Goodson v. Am. Standard Ins. Co.,* 89 P.3d 409, 414 (Colo.2004); *Cary v. United of Omaha Life Ins. Co.,* 68 P.3d 462, 466 (Colo.2003)(addressing implied contractual duty of good faith and fair dealing). When interpreting a contract, we consider "the facts and circumstances attending its execution, so as to learn the intentions of the parties." *Eisenhart v. Denver,* 27 Colo.App. 470, 478, 150 P. 729, 732 (1915), *aff'd,* 64 Colo. 141, 170 P. 1179 (1918). In contractual settings, we can look to the circumstances surrounding the contract's formation in construing the contract, in order to carry out the intent of the contracting parties. *Lazy Dog Ranch v. Telluray Ranch Corp.,* 965 P.2d 1229, 1235 (Colo.1998).

■ Furthermore, the substance, main objective, and purpose of the contractual agreement control over the form of the contract. 17A Am.Jur.2d *Contracts* § 336 (2006). Accordingly, contractual conditions may be implied by law, the purpose of the contract, or the intent of the parties. *Mumblow v. Monroe Broad., Inc.,* 401 F.3d 616, 622 (5th Cir.2005). Conditions are implied in fact when those conditions are "necessarily inherent in the actual performance of the contract." *Bergman v. Commerce Trust Co.,* 35 Kan.App.2d 301, 129 P.3d 624, 628 (2006) (citing 13 Williston on Contracts § 38.11 (4th ed.2000) ).

■ In the case before us, the parties to the real estate referral fee agreement alleged to exist in this case had previously consented to arbitrate disputes arising among themselves while each was a member of the professional organization. They had not rescinded their consents to arbitrate when the disputes between them arose. Each was still a member of the professional organization that set forth guidelines and procedures for such arbitration. These undisputed facts and the extensive documentary evidence in the

record spelling out this duty to arbitrate were the basis for the district court's order compelling arbitration and for our legal conclusion in this case upholding the district court's arbitration order. The district court did not abuse its discretion.

An articulated purpose and objective of joining the REALTOR® organization is to facilitate the resolution of disputes through arbitration. This duty to arbitrate is a condition of their membership agreements and, consequently, of their professional relationship while members. When members of the organization subsequently enter into agreements among themselves, such as the alleged referral fee agreement in this case, and have not rescinded their previously-executed consents to arbitration, those consents become an implied condition of doing business with each other and of their contractual performance.

By the plain language of the membership applications they signed, Urgitus and Calhoun each consented to binding arbitration should a dispute arise between them during the time they were members of the DMCAR. The notice contained in the applications concerning this duty to arbitrate is explicit and is repeated three times on the face of the signature page above each of their signatures.

The record in this original proceeding demonstrates that arbitration is both a benefit and duty that DMCAR REALTOR® professionals undertake to receive and perform from, for, and with each other. Incorporated by reference in the signed applications are the ethical code, standards, and arbitration manual of these interconnected local and national organizations that spell out clearly and unambiguously this reciprocal duty to arbitrate. This duty to arbitrate applies to all disputes concerning compensation that arise among members of DMCAR, which is affiliated with the interconnected REALTOR® organizations.

The primary defense to the existence of an arbitration agreement in this case is that there is no direct written agreement among Urgitus and Lane or Calhoun and Lane; thus, there can be no enforceable agreement to arbitrate in this case pursuant to Colorado's arbitration act. We disagree.

Pursuant to Article XVIII, section 3 of the Colorado Constitution, the General Assembly's enactment of the Uniform Arbitration Act, sections 13–22–201 to –239, provides a uniform statutory framework for arbitration in order to encourage the settlement of disputes. All doubts as to whether a dispute is arbitrable are to be resolved in favor of arbitration. *In re Marriage of Popack*, 998 P.2d at 467; *Farmers Ins. Exch. v. Taylor*, 45 P.3d at 761.

 Thus, the General Assembly intended that Colorado's arbitration act would encompass all forms of contract and contract conditions that expressly or impliedly include a duty to arbitrate. Under Colorado law, contractual conditions may be express or implied. *Goodson v. Am. Standard Ins. Co.*, 89 P.3d at 414; *Cary v. United of Omaha Life Ins. Co.*, 68 P.3d at 466. We may look to the circumstances surrounding the contract's formation in construing the contract, in order to carry out the intent of the contracting parties. *Lazy Dog Ranch v. Telluray Ranch Corp.*, 965 P.2d at 1235. When the record of the agreement we are called upon to construe or enforce consists of documentary evidence, we may base our legal conclusion upon that documentary evidence and do not depend upon a trial court's factual findings or interpretation of that evidence. *Winslow Constr. Co. v. City & County of Denver*, 960 P.2d 685, 692 (Colo.1998); *M.D.C./Wood, Inc. v. Mortimer*, 866 P.2d 1380, 1382 (Colo.1994) (stating that "when facts are presented to the trial court by stipulation, or uncontested documentary evidence, that an appellate court may draw its own conclusions"); *see also Archangel Diamond Corp. v. Lukoil*, 123 P.3d 1187, 1195 (Colo.2005) ("We review documentary evidence de novo.").

 As demonstrated by the case before us, an agreement to arbitrate can take the form of previously-executed consents to arbitrate that become an implied condition of subsequent agreements the members of the professional organization make among themselves. Section 13–22–206(1) of Colorado's arbitration act provides that "[a]n agreement

contained in a record to submit to arbitration any existing or subsequent controversy arising between the parties to the agreement is valid, enforceable, and irrevocable except on a ground that exists at law or in equity for the revocation of a contract."

The litigants here are sophisticated business persons who agreed to abide by a set of governance rules and ethical standards that included professional commitments beyond those otherwise required by Colorado law and the regulations of the Colorado Real Estate Commission. Economic advantage to each other as fellow DMCAR REALTORS® is clearly a benefit of belonging to the national and local organizations. Valid contractual duties can arise out of a network of agreements involving commercially sophisticated parties who are able to bargain for an allocation of risks, duties, and remedies. *See, e.g., BRW, Inc. v. Dufficy & Sons, Inc.,* 99 P.3d 66, 73 (Colo.2004). As clearly shown by the present case, REALTOR® members are encouraged to refer real estate transactions to each other, to contract with each other for a fee for such referrals, and to avoid a course of contested litigation should a dispute arise while they are members.

■ Our court of appeals has held that arbitration provisions and procedures contained in a voluntary membership organization of real estate professionals are binding on its members. *Jorgensen Realty, Inc. v. Box,* 701 P.2d 1256, 1257–58 (Colo.App.1985). We observe that the *Jorgensen* case and other professional real estate organization cases like it arise when the contracting parties to professional agreements attempt to avoid enforcement of their prior unrescinded arbitration consents.

Other jurisdictions are in accord with our holding here, particularly when addressing REALTOR® organization members and the duty to arbitrate. The Oklahoma Court of Civil Appeals applied *Jorgensen* to REALTOR® members who had a real estate sales commission dispute between themselves. *Rogers Realty, Inc. v. Smith,* 76 P.3d 71, 72 (Okla.Civ.App.2003). *See also Topolski v. Helena Ass'n of Realtors, Inc.,* 303 Mont. 224, 15 P.3d 414, 414 (2000) (holding that terms of brokers' membership in associ-ation required them to arbitrate dispute with client, even though they had not entered into any other contract or agreement with client to arbitrate disputes with her); *King v. Larsen Realty, Inc.,* 121 Cal.App.3d 349, 357, 175 Cal.Rptr. 226 (1981) (holding that members of the California Association of Realtors are bound to arbitrate when they have contracted to abide by the Association's bylaws, and those bylaws impose a duty to arbitrate); *Bastone v. Dial–A–House,* 100 Misc.2d 1026, 1027, 420 N.Y.S.2d 467 (1979) (holding that realtor, "by virtue of his membership, was bound by the duly enacted provisions of the constitution and bylaws" of the local board of realtors); *Elbadramany v. Stanley,* 490 So.2d 964, 966 (Fla.App.1986) (holding that "a provision in the constitution, charter or by-laws of voluntary association which requires that disputes between members be submitted to arbitration constitutes a binding agreement between such members to submit future disputes to arbitration"); *Van C. Argiris & Co. v. Pain/Wetzel & Assocs., Inc.,* 63 Ill.App.3d 993, 20 Ill.Dec. 616, 380 N.E.2d 825, 828 (1978) (holding that bylaws of real estate brokers' organization constitute contractual agreement between members to arbitrate and dispute between said members relating to "matters arising out of their business as brokers or agents" is subject to arbitration).

Here, the DMCAR applications for membership signed by Urgitus and Calhoun incorporate by reference the terms of the *"Code of Ethics* of the National Association of REALTORS®, including the duty to arbitrate business disputes in accordance with the *Code of Ethics* and Arbitration Manual of the Board and the Constitutions, Bylaws, and Rules and Regulations of [DMCAR or the Denver Board], the Colorado Association and the National Association."

The referenced Code of Ethics requires arbitration when a dispute arises out of the parties' "relationship as REALTORS®."

In the event of contractual disputes or specific non-contractual disputes as defined in Standard of Practice 17–4 between (principals) associated with different firms, arising out of their relationship as REALTORS®, the REALTORS® shall

submit the dispute to arbitration in accordance with the regulations of their Board or Boards rather than litigate the matter.

National Association of REALTORS®, Code of Ethics and Standards of Practice, Article 17, in *Manual* at 12.[8]

Neither Urgitus, nor Calhoun, may defeat the arbitration of transactions and fee disputes that arose during their membership in the REALTOR® organization by withdrawing from membership after the disputes with Lane arose. The plain language and meaning of the REALTOR® documents in this original proceeding, incorporated by reference in the signed application for memberships, requires arbitration of disputes arising when the disputants were members. This lawsuit addresses only such disputes.

■ If they entered into the referral fee agreement as alleged in the complaint, which is a factual matter for determination in the arbitration under section 13–22–206(3), C.R.S. (2006), then Urgitus and Lane became bound by the implied condition to arbitrate that is enforceable under Colorado's arbitration act. A valid arbitration provision of a contract divests a trial court of jurisdiction over all questions that are to be submitted to arbitration, pending conclusion of arbitration. The district court did not err in ordering arbitration in this case.[9]

■ Because the district court should have stayed the lawsuit pending arbitration pursuant to section 13–22–207(7), rather than dismissing it, we set aside the district court's dismissal order, and order the lawsuit stayed pending arbitration.

### III.

Accordingly, we affirm the district court's arbitration order, discharge our rule in part, and make our rule absolute in part.

Justice EID specially concurs.

Justice COATS dissents.

Justice EID, specially concurring.

I agree with the majority that the trial court correctly ordered the parties to arbitrate their dispute, but I reach that result by taking a different route.

The majority finds the required "agreement to arbitrate," § 13–22–207(1), C.R.S. (2006), in the referral fee agreement between plaintiff Lane and defendants Urgitus and Calhoun. Maj. op. at 682. According to the majority, implied in that agreement is a term obligating the parties to arbitrate any dispute that might arise between them—a term that exists by virtue of their membership in a voluntary professional association that created a "duty to arbitrate" as a "condition of their membership agreements. . . ." *Id.* at 680.

By contrast, in my view, the relevant "agreement[s] to arbitrate" are the *express* agreements between Urgitus and DMCAR and Calhoun and DMCAR (the "Membership Agreements"), which require Urgitus and Calhoun to submit any dispute over referral fees involving other DMCAR members to arbitration. As I explain below, Lane is a third-party beneficiary to the Membership Agreements, and as such he is entitled to enforce those agreements in order to compel Urgitus and Calhoun to arbitrate.

No one disputes the fact that both Urgitus and Calhoun entered into the Membership Agreements with DMCAR. In these agreements, Urgitus and Calhoun both committed to "arbitrate business disputes" with other DMCAR members "in accordance with the *Code of Ethics* and Arbitration Manual of the Board and the Constitutions, Bylaws, and Rules and Regulations" of DMCAR. *Id.* at 676. The *Code of Ethics*, in turn, makes clear that the duty to arbitrate extends to all

---

8. Originally adopted in 1913, the Code of Ethics has been amended from time to time. We cite to the 2005 edition of *Code of Ethics and Arbitration Manual* which was in effect at the time the dispute arose and the arbitration complaint was filed. This edition includes all case interpretations approved by the Professional Standards Committee through 2004.

9. We decline to award attorneys fees in this original proceeding because we accepted jurisdiction to review an important public issue we had not previously decided, and we do not find its presentation to have been frivolous.

disputes over "entitlement to commissions and compensation in cooperative transactions that arise out of the business relationships between REALTORS® . . . ." *Id.* at 676.

Lane's referral fee dispute with Urgitus and Calhoun is precisely the type of dispute among REALTORS® contemplated by the Membership Agreements. The only question is whether Lane can enforce Urgitus's and Calhoun's promises to DMCAR to arbitrate this dispute. In my view, he can.

A non-party can compel arbitration if it can show that it is a third-party beneficiary to an arbitration agreement. *See Eagle Ridge Condominium Ass'n v. Metro. Builders, Inc.,* 98 P.3d 915, 917 (Colo.App.2004) ("A nonparty, such as a third-party beneficiary, may fall within the scope of an arbitration agreement and may bring an action on the contract if that is the intent of the parties."); *Parker v. Ctr. for Creative Leadership,* 15 P.3d 297, 298 (Colo.App.2000) (same); *Eychner v. Van Vleet,* 870 P.2d 486, 489 (Colo. App.1993) (same). This is an unremarkable application of the black-letter rule that a third-party beneficiary may enforce the terms of a contract. *See, e.g., Jefferson County Sch. Dist. No. R–1 v. Shorey,* 826 P.2d 830, 843 (Colo.1992) (describing the third-party beneficiary doctrine as a "basic rule of contract law"); *E.B. Roberts Constr. Co. v. Concrete Contractors, Inc.,* 704 P.2d 859, 865 (Colo.1985) (applying the third-party beneficiary doctrine). In order to enforce the terms of a contract as a third-party beneficiary, a plaintiff must show (1) that the contracting parties intended to benefit the third party, and (2) that the claimed benefit is a direct and not merely incidental benefit of the contract. *See E.B. Roberts,* 704 P.2d at 865 (citations omitted).

The language of the Membership Agreements clearly demonstrates that the contracting parties—here, Urgitus, Calhoun, and DMCAR—intended to benefit other REALTOR® members such as Lane. In the Agreements, Urgitus and Calhoun pledged to "arbitrate business disputes in accordance with the *Code of Ethics,*" which in turn requires the arbitration of disputes over referral fees that arise between REALTORS®. The purpose of this provision has a single intended beneficiary: REALTOR® members, such as Lane, who may have disputes with the contracting parties. Indeed, the obligation to arbitrate benefited Urgitus and Calhoun as well, as they could seek to recover referral fees from other REALTOR® members through arbitration in the future.

It is true that Lane was not specifically named as a third-party beneficiary of the Membership Agreements. Yet "it is not necessary that the third party be specifically referred to in the agreement. It is sufficient if the claimant is a member of the limited class that was intended to benefit from the contract." *Smith v. TCI Commc'ns, Inc.,* 981 P.2d 690, 693 (Colo.App.1999). Here, the "limited class" of beneficiaries was defined by the Membership Agreements and the *Code of Ethics* as other members of the REALTOR® organization with whom the member might have a business dispute. *See, e.g., Bloom v. Nat'l Collegiate Athletic Ass'n,* 93 P.3d 621, 623–24 (Colo.App.2004) (holding that a student-athlete at the University of Colorado could sue under the bylaws of the NCAA, which were binding on member schools like Colorado, because "the NCAA's constitution, bylaws, and regulations evidence a clear intent to benefit student-athletes").

Furthermore, Lane's benefit from the Membership Agreements was direct, not incidental. The Membership Agreements specifically contemplate that a benefit of DMCAR membership is the right to have disputes with other members arbitrated rather than litigated. *Compare Shorey,* 826 P.2d at 843 (finding that dispute resolution procedure in collective bargaining agreement was directly intended to benefit union members such as plaintiff), *and Villa Sierra Condominium Ass'n v. Field Corp.,* 878 P.2d 161, 166 (Colo. App.1994) ("[A]n agreement between a local government and another party was designed to bestow a direct benefit upon private property, thereby making the owners of that property direct third-party beneficiaries of the agreement."), *with Fourth & Main Co. v. Joslin Dry Goods Co.,* 648 P.2d 178, 181 (Colo.App.1982), *disapproved of in part in E.B. Roberts,* 704 P.2d at 865 n. 7 (noting that an incidental benefit usually is nothing

more than a "fortuitous windfall" from an agreement, not an express term of the agreement designed to benefit a third party).

I share Justice Coats's belief that we should be hesitant to "erode the independence of parties to fix the terms of their own contracts. . . ." Diss. Op. at 684. In this case, however, I believe that Urgitus and Calhoun did fix the terms of their own contracts with DMCAR with the intention of benefiting other REALTORS® as third parties. Because Lane is a third-party beneficiary to the Membership Agreements, he is entitled to enforce their arbitration provisions. I therefore agree with the majority that the trial court correctly compelled arbitration, and specially concur on that basis.

## Justice COATS, dissenting.

In its search for a statutorily cognizable arbitration agreement, the majority conflates two distinct doctrines to impute a new term of contract from the parties' membership in a common voluntary association. Despite its characterization of this new doctrine of imputed promises as limited in scope, today's holding cannot help but further erode the independence of parties to fix the terms of their own contracts and the ability of voluntary associations to control their internal operations without undue interference by the courts. Because I consider this imposition of unintended terms to be both unwarranted and likely to work substantial mischief, I respectfully dissent.

In 1975, Colorado enacted a version of the Uniform Arbitration Act, attaching specific legal consequences to agreements between disputing parties to arbitrate their disputes. *See* "Uniform Arbitration Act of 1975," §§ 13–22–201 to –223, C.R.S. (2003) (adopting Unif. Arbitration Act, 1956 Act §§ 125, 7 U.L.A. 95, 95–768 (2005)). We have previously interpreted the arbitration act to limit enforceable arbitration agreements, from which these legal consequences flow, to agreements satisfying the elements of a contract between the disputing parties. *See, e.g., Hughley v. Rocky Mountain Health Maint. Org., Inc.,* 927 P.2d 1325, 1330 (Colo. 1996). Although the majority refers to the language of the 2004 revision of the Act, see Uniform Arbitration Act §§ 13–22–201 to 229, C.R.S. (2006) (adopting Unif. Arbitration Act (2000) §§ 13–3, 7.U.L.A. 1, 10–94 (2005) ),[1] it clearly limits "agreements to arbitrate," within the meaning of the statute, to contractual obligations. *See, e.g.,* maj. op. at 677–78, 679 (citing *Howsam v. Dean Witter Reynolds, Inc.,* 537 U.S. 79, 123 S.Ct. 588, 154 L.Ed.2d 491 (2002)).[2]

Although it seems clear that the district court had no such intention when it ordered the parties to submit to arbitration pursuant to the rules of the Denver Metropolitan Commercial Association of REALTORS (DMCAR), the majority essentially frames the issue of this original proceeding as whether membership in the association necessarily implies a condition of all future referral contracts between members, amounting to an "agreement to arbitrate" within the meaning of the statute. In its quest for a rationale to elevate the association's arbitration requirement to the level of a contractual obligation of each member to the others, the majority intuitively merges two different contract theories, neither one of which is quite applicable or equal to the task. On the one hand, it treats the subsequent referral agreement of the parties as the contract at issue and looks to law governing implied conditions for support. And on the other, it looks for support in case law treating membership in a voluntary association as a contract between the association and its members and the

---

**1.** Section 13–22–203, C.R.S. (2006), specifies that the new statute will apply only to agreements to arbitrate made on or after August 4, 2004, unless the parties otherwise agree, on the record. Since the parties do not agree that the arbitration statute applies at all, they clearly have not agreed to application of the 2004 Act.

**2.** Even the revised version of the Act, to which the majority refers, continues to assign to the court the initial obligation of determining whether there is an "agreement to arbitrate" between the parties. *See* Unif. Arbitration Act (2000) § 6 cmt. 2, 7 U.L.A. 24 (2005) ("[W]hether a dispute is encompassed by an agreement to arbitrate [is] for a court to decide and issues of procedural arbitrability, i.e., whether prerequisites such as time limits, notices, laches, estoppel, and other conditions precedent to an obligation to arbitrate have been met, are for the arbitrators to decide."); *cf.* maj. op. at 674 n. 2.

rules and bylaws of the association as binding on the members.

With regard to the former, the agreement to arbitrate imputed by the majority to the referral contract can hardly be described as a condition of performance at all. It is clearly a separate promise or term in its own right. *See* 13 Richard A. Lord, Williston on Contracts § 38:5 (4th ed. 2000) ("A promise is a manifestation of an intention to act . . . in a specified way . . . while a condition is an event, not certain to occur, which must occur, unless its nonoccurrence is excused, before performance under a contract becomes due."). Furthermore, it is neither implied by the terms of the parties' referral agreement nor implied by extrinsic evidence of the actual intent of the parties.[3] Instead, the majority imputes it, as a matter of law, from separate promises to the association to arbitrate disputes with fellow members.

While we have allowed that parties may be bound, under limited circumstances, by custom or industry practice, at the same time we have held that the parties must not only have known of the custom but must have contracted with reference to it. *See Garman v. Conoco, Inc.*, 886 P.2d 652, 660 (Colo.1994); *cf. Fleming v. Gill*, 60 Colo. 294, 297, 153 P. 88, 88–89 (1915) (refusing to alter specific commission agreement on basis of custom among Denver real estate brokers to divide commissions). In any event, these are matters of fact, ultimately subject to the intent of the parties to any particular contract. *See Pittman v. Larson Distrib. Co.*, 724 P.2d 1379, 1384–85 (Colo.App.1986). The district court made no such factual determinations in this case, and for aught that appears in the allegations of the parties about their prior dealings or the terms of their cursory, e-mail referral agreement,[4] there is little reason to believe such a promise was intended. Rather than look to the terms of the specific referral agreement and, if appropriate, the circumstances surrounding its formation, however, the majority creates a new rule of imputed promises, constructively finding a promise to arbitrate in subsequent contracts between members of a private association, the bylaws of which impose such a duty.

Sensing perhaps the novelty of this proposition, the majority offers, in reliance on our holding in *BRW, Inc. v. Dufficy & Sons, Inc.*, 99 P.3d 66, 73 (Colo.2004), that "valid contractual duties can arise out of a network of agreements involving commercially sophisticated parties." Maj. op. at 681. In *Dufficy* we held only that the duty of care owed by the designing engineer for a Denver City construction project and its project inspector, to a sub-contractor contractually obliged to follow the engineer's plans and specifications, was defined by the interrelated project contracts, which therefore also limited the subcontractor's remedies for economic loss. The transformation of that proposition into a rule imputing to private contracts the bylaws of voluntary associations is not only unwarranted by anything in our opinion in *Dufficy* but dramatically alters settled law governing private associations. *See Scott v. Lee*, 208 Cal. App.2d 12, 24 Cal.Rptr. 824, 826 (1962) (finding that association rules failed to create a contract enforceable by one member against another); *see also Savoca Masonry Co. v. Homes & Son Constr. Co.*, 112 Ariz. 392, 542 P.2d 817, 821 (1975) (relying on *Scott); Coyle v. Morrisdale Coal Co.*, 284 F. 294, 295 (S.D.N.Y.1922) ("At common law it is the general rule that the members of an unincorporated association may not sue at law one of their number on a contract between himself and them."); *McMahon v. Rauhr*, 47 N.Y. 67, 67 (1871) ("A member of a voluntary [association] . . . cannot . . . maintain an action at law, in behalf of the association, against another member upon any agreement made with the association.").

With regard to the majority's claim of support from settled law treating arbitration provisions of voluntary associations as bind-

---

**3.** Such extrinsic evidence could certainly exist, but the district court issued its arbitration order without any findings of fact, conclusions of law, or for that matter, any explanation whatsoever.

**4.** The only written evidence of any agreement between the parties, one that never mentions a

REALTOR® association of any kind, consists of a two-line email from Urgitus to Lane stating, "Bob, Per our conversation CB Richard Ellis agrees to pay Lane Realty a referral fee of 20% on any deals going forward with John P. Weberg. Please call me with any questions. Thank you."

ing on their members, I believe the majority similarly misperceives the import of those authorities. Ironically, the rule upon which the court of appeals relied in *Jorgensen Realty, Inc. v. Box*, 701 P.2d 1256 (Colo.App. 1985)—that the relationship between a voluntary association and its members is a contractual one and, by joining such an organization, a member agrees to submit to its rules and regulations and assumes the obligations incident to membership—should have caused the district court to decline interference in association matters rather than finding a binding contractual agreement between association members. In *Jorgensen*, when faced with a member's challenge to a realtor association's resolution of an arbitration dispute according to its own Code of Ethics and Arbitration Manual, the court of appeals held that "[i]n the absence of clearly arbitrary and unreasonable invasion of a member's rights, courts will not review the internal operation and affairs of voluntary organizations." *Id.* at 1258.

While the contract model for explaining the relationship between voluntary associations and their members has not been without theoretical criticism, *see, e.g.,* Zechariah Chafee, *The Internal Affairs of Associations Not for Profit*, 43 Harv. L.Rev. 993, 1001–07 (1930); *NAACP v. Golding*, 342 Md. 663, 679 A.2d 554, 559–62 (1996), it has long been accepted by the courts, not as a basis for enforcing association rules against one member at the behest of another, but rather as a basis for deferring to the association's resolution of member-to-member disputes according to its own procedures. *See Jorgensen Realty, Inc.*, 701 P.2d at 1258; *see also Crane v. Ind. High Sch. Athletic Ass'n*, 975 F.2d 1315, 1329 (7th Cir.1992) (Posner, J., dissenting) ("Hence [courts] will not enforce rights created by [an association's] rules, but only civil or political rights having their origin elsewhere."); *Houston Oilers, Inc. v. Harris County, Tex.*, 960 F.Supp. 1202, 1207 (S.D.Tex.1997) ("The principal reason courts ought not to intrude into internal operations of consensual associations is that participants have agreed to abide by their own informal mechanism for resolving disputes."); *Lawson v. Hewel*, 118 Cal. 613, 50 P. 763, 764 (1897) (whether rules have been violated and appro-

priate penalty are "eminently fit for the association itself to determine"); *Van Valkenburg v. Liberty Lodge No. 300 A.F. & A.M.*, 9 Neb.App. 782, 619 N.W.2d 604, 607 (2000) ("Generally courts will not interfere with the internal affairs of an association to settle disputes between members or with regard to discipline or internal government, provided that the government of the association is administered fairly and in conformity with its laws and other applicable law and no property or civil rights have been violated.").

Of the six other jurisdictions noted by the majority as support for its rationale, three merely held, along with our court of appeals in *Jorgensen*, that the member-parties were bound to comply with their own association's bylaws. *See Rogers Realty, Inc. v. Smith*, 76 P.3d 71 (Okla.Civ.App.2003); *King v. Larsen Realty, Inc.*, 121 Cal.App.3d 349, 175 Cal. Rptr. 226 (1981); *Bastone v. Dial–A–House, Inc.*, 100 Misc.2d 1026, 420 N.Y.S.2d 467 (Sup.Ct.1979). Of the remaining three, one dealt with association bylaws that specifically incorporated state statutes, characterizing membership in the association as a statutory agreement to arbitrate according to those statutes, *see Van C. Argiris & Co. v. Pain/Wetzel & Assocs., Inc.*, 63 Ill.App.3d 993, 20 Ill.Dec. 616, 380 N.E.2d 825 (1978), and the remaining two construed state statutes that significantly expanded the definition of an agreement to arbitrate beyond that included in the Uniform Arbitration Act. *See Topolski v. Helena Ass'n of Realtors, Inc.*, 303 Mont. 224, 15 P.3d 414 (2000) (finding an agreement to arbitrate under Montana's statute, which had been modified from the uniform act to expressly include a written agreement between members of a professional organization to submit to arbitration controversies arising between members); *Elbadramany v. Stanley*, 490 So.2d 964 (Fla. Dist.App.1986) (finding an agreement to arbitrate under Florida's statute, which had been modified from the uniform act to include such things as inter-local agreements in which two or more parties agree to submit to arbitration controversies concerning water use permits applications). Whatever those courts might think about the issue pending before us today, their prior holdings concern-

ing their substantially different statutes hardly provide persuasive authority for us.

The difference between providing a statutory remedy for contractual agreements to arbitrate and deferring to resolution of member disputes by private associations is not without significance. While Lane might still be entitled to a remedy in the bylaws of the association, it is far from clear that such a remedy could include an order to submit to arbitration. *See* Denver Metro. Commercial Ass'n of REALTORS®, *Bylaws,* art. VI, § 2 (2004) ("Any REALTOR® Member ... may be reprimanded, fined, placed on probation, suspended, or expelled by the Board of Directors for a violation of these Bylaws...."); Nat'l Ass'n of REALTORS®, *Code of Ethics and Arbitration Manual* § 14 (2005) ("Disciplinary action may only consist of one or more of": written warning, written reprimand, requirement to re-take ethics class, fine not to exceed $5,000, probation, suspension, expulsion with possibility of reinstatement, or termination.). In any event, it appears from the record before us that Lane did not pursue any resolution by, or sanction from, the association, once Urgitus and Calhoun refused to arbitrate and submitted their resignations. Neither did he seek court enforcement of any order of the association for violation of its own rules.[5]

In my view, the membership agreement and bylaws of the association amounted at most to a promise or agreement to enter into contractual agreements with other member-realtors to arbitrate disputes over their joint real estate contracts, which clearly did not occur in this case. By treating the membership application itself as a contractual obligation between members to comply with the constitution, bylaws, and rules of the association, affording contractual remedies to members for violations by other members, the majority stands the rule it seeks to follow on its head, endangering the deference traditionally shown to voluntary associations of all kinds.

For largely the same reasons, I can take little comfort in the third-party beneficiary theory of the special concurrence. A third-party beneficiary's right to enforce a contract cannot rise higher than the rights of the contracting party through whom he claims. *See* 13 Richard A. Lord, Williston on Contracts § 37:23 (4th ed.2000). If membership in a voluntary association merely constitutes an entitlement to, and agreement to be bound by, the association's resolution of internal matters and enforcement of its own rules, a fellow member can benefit from the membership contract of another no more than to have the association's rules enforced upon the offending member. If membership in the association does not constitute a statutory agreement to arbitrate at all, it cannot constitute an agreement to arbitrate benefiting a third party.

Admittedly, there is evidence in the comments added to the 2000 revision of the Uniform Arbitration Act that its drafters intended arbitration provisions contained in the bylaws of corporate or other associations to be enforceable arbitration agreements. *See* Unif. Arbitration Act (2000) § 6 cmt. 1, 7 U.L.A. 23, 2324 (2005). Even if Colorado's later adoption of the 2000 revision applied to this case, however, the general assembly chose not to adopt those comments, in stark contrast to its choice in adopting other uniform acts. *See, e.g.,* Uniform Child–Custody Jurisdiction and Enforcement Act (UCCJEA) §§ 14–13–101 to –403, C.R.S. (2006). I have little doubt that the general assembly could create a statutory obligation to arbitrate flowing from membership in private associations if it chose to do so, but I do not consider such an obligation compatible with existing contract law.

Because I do not believe our current statute indicates such a legislative choice, and unlike the majority, I do not consider it the role of the courts to impute arbitration provisions of private associations to individual contracts between members, I respectfully dissent.

---

5. Despite the resignations of Urgitus and Calhoun, the bylaws of the association purported to bind them to arbitrate disputes with other members arising while they were still members. *See Bylaws* art. VI § 5(a).