Chris and Cindy INGOLD, Plaintiffs

v.

AIMCO/BLUFFS, L.L.C. APARTMENTS, a/k/a AIMCO/Bluffs, L.L.C.; AIMCO Properties, L.P., d/b/a Boulder Creek Apartments; and James R. Macias, Defendants.

No. 06SA240.

Supreme Court of Colorado, En Banc.

May 29, 2007.

Irwin & Boesen, P.C., Chris L. Ingold, Denver, Colorado, Pro Se and Attorney for Plaintiff Cindy Ingold.

Fisher, Sweetbaum, Levin & Sands, P.C., Jon F. Sands, Brad Ramming, Denver, Colorado, Attorneys for Defendants.

Justice EID delivered the Opinion of the Court.

This case concerns an arbitration clause in an apartment lease entered into between Plaintiffs Chris and Cindy Ingold and one of the Defendants, Boulder Creek Apartments. We issued a rule to show cause to review the trial court's order compelling the Ingolds to arbitrate their claims against Boulder Creek Apartments as well as its parent company, Defendant AIMCO/Bluffs LLC, and its employee, Defendant James R. Macias (collectively, the "Defendants"). We make the rule absolute in part, discharge it in part, and remand with directions.

## I.

For purposes of this proceeding the factual allegations set forth in the Ingolds' complaint are accepted as true. *See Rosenthal v. Dean Witter Reynolds, Inc.*, 908 P.2d 1095, 1099 (Colo.1995).

The Ingolds entered into a one-year apartment lease with Boulder Creek Apartments in July 2001 (the "Lease"). Section 30 of the Lease provides: "All disputes between the parties concerning the provisions of this Lease shall be submitted to arbitration...." Only the Ingolds and Boulder Creek Apartments are identified as parties to the Lease.

After taking possession of their apartment in August, the Ingolds smelled a foul odor in the unit. The Ingolds were advised that the odor resulted from a ruptured sewer pipe underneath the apartment building, and that the pipe would be repaired. When they returned to the unit in September, the foul odor was gone.

Problems with the apartment unit persisted, either because the sewer pipe was inadequately repaired or because sewage from the initial rupture was not removed from underneath the apartment building. The Ingolds again were told that the Defendants were addressing the problem. The Ingolds claim that they relied on these representations when agreeing to renew their Lease in August 2002 for another one-year term.

Shortly after renewing the Lease, the Ingolds began to suffer health problems associated with mold and bacteria, problems that they attribute to the sewage left under their apartment. A microbiologist hired by the Ingolds analyzed samples from the apartment and concluded that the unit contained a serious mold and bacteria problem. Based on these findings, the Ingolds' physician advised them to leave the apartment.

When the Ingolds reported the microbiologist's findings to Boulder Creek Apartments, the apartment manager, James Macias, inspected the crawl space and attic of the apartment building. Macias advised that he detected no problem with mold or bacteria. An industrial hygienist hired by the Ingolds to inspect the apartment reached a different conclusion; he determined that both the crawl space and attic contained toxic levels of mold and bacteria.

The Ingolds abandoned the apartment unit in November 2002, leaving behind their possessions—and refusing to pay their November rent. Later that month, a representative of the Defendants contacted the Ingolds and denied any environmental problem with the apartment unit and informed them that they continued to be responsible for complying with the terms of the Lease, including their monthly rental payments. The Ingolds still refused to pay their rent.

In December 2002, Boulder Creek Apartments notified the Ingolds that their failure to pay rent resulted in a breach of the Lease, and demanded the payment of $6,095.55 as a termination fee. Boulder Creek Apartments also withheld the Ingolds' security deposit.

In October 2004, the Ingolds filed suit against the Defendants, advancing ten claims for relief: eight tort claims, a claim for viola-

tion of the Colorado Consumer Protection Act, sections 6–1–101 to –115, C.R.S. (2006), and a claim for violation of the Wrongful Withholding of Security Deposits Act, sections 38–12–101 to –104, C.R.S. (2006).[1]

The Defendants moved to dismiss the Ingolds' Complaint for lack of subject matter jurisdiction on grounds that the Lease required the Ingolds to arbitrate their claims. The Ingolds opposed arbitration, claiming that they had been fraudulently induced into entering the Lease based on the Defendants' representations that the apartment was habitable.

The trial court granted the Defendants' motion and held that all of the Ingolds' claims fell within the scope of the Lease's clause requiring the arbitration of "[a]ll disputes between the parties concerning the provisions of this Lease . . . ." The trial court further found that the "parties" to the Lease included AIMCO/Bluffs and James Macias, and ordered the Ingolds to arbitrate their claims against these Defendants as well as the signatory to the Lease, Boulder Creek Apartments.

We issued a rule to show cause to consider whether the trial court erred by compelling the parties to arbitrate. At oral argument, the Defendants acknowledged that the trial court should not have ordered the Ingolds to arbitrate their claims against AIMCO/Bluffs and James Macias, because these Defendants are not parties to the Lease.[2] We therefore only consider the trial court's arbitration order as it applies to Boulder Creek Apartments.

The Ingolds present three principal issues for our consideration:

First, the Ingolds allege that they were fraudulently induced into entering the Lease, and therefore that they cannot be bound by the Lease's arbitration clause. We disagree. As explained in section II of this opinion, the

Ingolds must arbitrate their claim of fraudulent inducement because it is directed to the enforceability of the Lease as a whole, not specifically to the Lease's arbitration provision.

Second, the Ingolds contend that their claims for relief fall outside the scope of the arbitration clause. In section III below, we find that all of the Ingolds' claims against Boulder Creek Apartments are arbitrable with the exception of their statutory claim for the wrongful withholding of their security deposit. This statutory claim cannot be arbitrated and must be resolved by the trial court.

Third, the Ingolds argue that the existence of multiple claims against multiple parties, less than all of which are arbitrable, precludes the arbitration of *any* of their claims against Boulder Creek Apartments, including those that fall within the scope of the parties' arbitration agreement. To support this argument, the Ingolds rely on the "intertwining doctrine" recognized in *Sandefer v. District Court*, 635 P.2d 547 (Colo.1981), *overruled in part on other grounds by Sager v. District Court*, 698 P.2d 250 (Colo.1985). *Sandefer* held that courts should not compel arbitration if the legal and factual issues raised by the arbitrable claims are "inextricably intertwined" with issues raised by non-arbitrable claims.

For the reasons explained in section IV below, we no longer believe that Colorado law supports the "intertwining doctrine," and we reject it by overruling *Sandefer* to the extent that it recognizes the doctrine. The Ingolds' arbitrable claims against Boulder Creek Apartments should proceed to arbitration, and on remand the trial court should consider whether to stay the Ingolds' non-arbitrable claims pending the outcome of arbitration or, alternatively, to allow the Ingolds to separately litigate some or all of their non-arbitrable claims.

---

1. The Ingolds asserted six claims against AIMCO/Bluffs and Boulder Creek Apartments; four other claims were asserted against James Macias as well as AIMCO/Bluffs and Boulder Creek Apartments.

2. We note that AIMCO/Bluffs and James Macias do not argue that they are entitled to the benefits

of the Lease on the basis of agency, *see Interbras Cayman Co. v. Orient Victory Shipping Co., S.A.*, 663 F.2d 4, 7 (2d Cir.1981), equitable estoppel, *see GATX Mgmt. Serv., LLC v. Weakland*, 171 F.Supp.2d 1159, 1166 (D.Colo.2001), or third-party beneficiary status, *see Lane v. Urgitus*, 145 P.3d 672, 682 (Colo.2006) (Eid, J., concurring).

## II.

■ Our analysis begins by addressing the Ingolds' claim that arbitration is inappropriate in this case because they were fraudulently induced by Boulder Creek Apartments into entering the Lease. According to the Ingolds, an allegation of fraudulent inducement is to be determined by the trial court—not the arbitrator—under the former version of the Colorado Uniform Arbitration Act, sections 13–22–201 to –223, C.R.S. (2003) (the "CUAA"). The former version of the CUAA is applicable to arbitration agreements, like the arbitration provision of the Lease, entered into before August 4, 2004. *See* § 13–22–203(1), C.R.S. (2006). Importantly, the Ingolds do not allege that Boulder Creek Apartments fraudulently induced them into agreeing to arbitrate. Rather, they claim that they were fraudulently induced into entering the Lease in its entirety. We hold that the Ingolds must arbitrate their fraudulent inducement allegations.

We begin by analyzing the text of the CUAA, giving its words their ordinary and commonly-understood meanings. *See Reuter v. Weber*, —— P.3d ——, ——, 2007 WL 1240199, at *3 (Colo. Apr.30, 2007). Section 13–22–203 of the former CUAA governs "provision[s] in a written contract to submit to arbitration any controversy thereafter arising between the parties...." Section 30 of the Lease clearly is such a provision. Arbitration provisions like section 30 are "valid, enforceable, and irrevocable, save upon such grounds as exist at law or in equity for the revocation of any contract." § 13–22–203, C.R.S. (2003). The Ingolds contend that the Lease—including its arbitration provision—is invalid and unenforceable ab initio because it is the result of fraudulent inducement.

We have not directly considered this issue under the former version of the CUAA. However, the answer can be found in section 13–22–204(1), which provides that "the court shall order the parties to proceed with arbitration, but, if the opposing party denies the existence of the agreement to arbitrate, the court shall proceed summarily to the determination of the issue...." The scope of the trial court's authority under section 13–22–

204(1) is manifestly narrow. The statute contemplates that the trial court will have the authority to consider one issue: "the existence of the agreement to arbitrate." § 13–22–204(1). All other issues, including challenges to the enforceability of the agreement under section 13–22–203, implicitly are the province of the arbitrator. Furthermore, the trial court's authority is limited to specific challenges to "*the agreement to arbitrate*," not the broader contract containing the arbitration provision. *Id.* (emphasis added). A fraudulent inducement claim, if it is to be considered by the trial court, must be directed specifically to fraud inducing the plaintiff to agree to arbitrate. Broader allegations of fraudulent inducement, like those alleged by the Ingolds, must be resolved in arbitration.

Our interpretation of the former version of the CUAA accords with the United States Supreme Court's interpretation of the Federal Arbitration Act. *See Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967). While *Prima Paint* is not controlling in this case, the Court's analysis nevertheless is persuasive to us since the Federal Arbitration Act and the former version of the CUAA contain substantially similar language. *See Furlong v. Gardner*, 956 P.2d 545, 551 (Colo.1998) ("In interpreting a state statute, we often turn to the analogous federal statute and related case law.").

In *Prima Paint*, the Court held that the "plain meaning" of section 4 of the Federal Arbitration Act reflected "the unmistakably clear congressional purpose" to treat two types of fraudulent inducement claims differently. 388 U.S. at 404, 87 S.Ct. 1801. Thus "if the claim is fraud in the inducement of the arbitration clause itself—an issue which goes to the 'making' of the agreement to arbitrate—the federal court may proceed to adjudicate it." *Id.* at 403–04, 87 S.Ct. 1801. This is consistent with the trial court's authority to consider challenges to the existence of "the agreement to arbitrate" itself. However, "the statutory language does not permit the federal court to consider claims of fraud in the inducement of the contract generally." *Id.* at 404, 87 S.Ct. 1801. Those claims must be resolved by the arbitrator.

The "separability doctrine" of *Prima Paint* has been criticized throughout its 40–year existence, beginning with Justice Black's heated dissent from the Court's opinion.[3] *See* 388 U.S. at 407, 87 S.Ct. 1801 (Black, J., dissenting). The Ingolds adopt much of the *Prima Paint* critique in their briefs: they contend that a challenge to the enforceability of a contract as a whole necessarily is a challenge to the enforceability of its parts, including an arbitration provision, and therefore must be considered by the trial court before compelling arbitration.

This reading of the CUAA relies exclusively on the language of section 13–22–203, which provides that an arbitration agreement is "valid, enforceable, and irrevocable," unless there are legal or equitable grounds for its revocation. But the statutory language upon which the Ingolds rely says nothing about *who* is to resolve a challenge to the validity, enforceability, or irrevocability of the contract. For this answer, we must look to section 13–22–204(1), which limits the trial court's authority to resolving disputes over "the existence of the agreement to arbitrate," including challenges to the existence of the specific agreement on grounds of fraudulent inducement. All other challenges are left for the arbitrator to resolve.

The Ingolds press further, and argue that there *is no contract* for purposes of section 13–22–203 because the Lease was the result of fraudulent inducement. But this is too narrow a reading of the word "contract" in section 13–22–203. The United States Supreme Court recently made this point in *Buckeye Check Cashing, Inc. v. Cardegna,* 546 U.S. 440, 126 S.Ct. 1204, 163 L.Ed.2d 1038 (2006). Reaffirming the holding of *Prima Paint,* the Court explained that "[t]here can be no doubt that 'contract' as used [in the Federal Arbitration Act] must include contracts that later prove to be void. Other-

wise, the grounds for revocation would be limited to those that rendered a contract voidable—which would mean (implausibly) that an arbitration agreement could be challenged as voidable but not as void." 546 U.S. at ——, 126 S.Ct. at 1210. In other words, a narrow reading of "contract" to include only enforceable contracts would gut the specific language of section 13–22–204 permitting the trial court to consider only challenges to the existence of *an agreement to arbitrate,* as opposed to challenges to the existence of the contract as a whole. The Court concluded that "contracts" submitted to arbitration under the statute "obviously includes *putative* contracts...." *Id.* (emphasis added).

The plain language of section 13–22–204 of the former version of the CUAA distinguishes between allegations of fraudulent inducement directed specifically to an arbitration provision in a contract and allegations of fraudulent inducement directed more broadly to the contract as a whole. The former must be decided by a trial court; the latter must be decided by the arbitrator.[4] While the duties of courts and arbitrators could have been divided differently, *see supra* at 121 n. 3, it is the distinction adopted by the General Assembly.

In this case, the Ingolds allege that they were fraudulently induced by one or more of the Defendants into entering the Lease. Since the Ingolds' allegations of fraud are not directed specifically to the Lease's arbitration provision, this is an issue that must be decided by the arbitrator, not the trial court. The trial court therefore was correct to order the Ingolds to submit all arbitrable claims against Boulder Creek Apartments to arbitration, and as to this issue we discharge the rule to show cause.

### III.

Having established that the Ingolds must arbitrate their claim of fraudulent induce-

---

3. Justice Black's criticism of the Court's distinction between fraudulent inducement allegations continues to find support in the legal academy. *See* Stephen J. Ware, *Employment Arbitration and Voluntary Consent,* 25 Hofstra L.Rev. 83, 131 (1996); Richard C. Reuben, *First Options, Consent to Arbitration, and the Demise of Separability: Restoring Access to Justice for Contracts with Arbitration Provisions,* 56 SMU L.Rev. 819, 845 (2003).

4. The current version of the CUAA similarly distinguishes between the two types of fraudulent inducement allegations. *See J.A. Walker Co. v. Cambria Corp.,* No. 06SA272, 159 P.3d 126, 2007 WL 1532137 (Colo. May 29, 2007) (interpreting § 13–22–206, C.R.S. (2006)).

ment against Boulder Creek Apartments, we turn to whether the Ingolds must arbitrate their other tort and statutory claims against Boulder Creek Apartments. We hold that the Ingolds' tort claims against Boulder Creek Apartments must be arbitrated, that their claim for violation of the Colorado Consumer Protection Act likewise must be arbitrated, but that their statutory claim under the Colorado Wrongful Withholding of Security Deposits Act, sections 38–12–101 to –104, C.R.S. (2006), is not subject to arbitration and must be resolved by the trial court.

## A.

The Ingolds have asserted several tort claims against Boulder Creek Apartments: frustration of the lease, breach of the covenant of quiet enjoyment, constructive eviction, negligence, bad faith, civil conspiracy, and outrageous conduct. The Ingolds also allege that Boulder Creek Apartments engaged in deceptive trade practices, thereby violating the Colorado Consumer Protection Act, section 6–1–105, C.R.S. (2006) (the "CCPA"). Because of their artful avoidance of any claim for breach of contract, the Ingolds argue that their tort and CCPA claims are not subject to the Lease's arbitration clause.

We rejected a similar argument in *City & County of Denver v. District Court*, 939 P.2d 1353, 1364 (Colo.1997), where we explained that "[t]he factual allegations which form the basis of the claim asserted, rather than the legal cause of action" pleaded, determines "whether a particular dispute falls within the reach of the [arbitration] clause." Thus "[t]ort claims and claims other than breach of contract claims are not necessarily excluded from ADR." *Id.*

Here, the Ingolds agreed with Boulder Creek Apartments to arbitrate *"[a]ll disputes* between the parties concerning the provisions of the Lease . . . ." (emphasis added). Looking to the Ingolds' factual allegations, we find that their tort and CCPA claims are disputes "concerning the provisions of the Lease," because each claim is

based on duties created by—or rights owed on account of—the Lease. For example, the Ingolds allege that "[p]ursuant to the Lease Agreement, AIMCO/Bluffs and Boulder Creek were responsible to make sure that the [Ingolds] would be able to quietly enjoy the leased premises," and therefore "breached the covenant of quiet enjoyment" by failing to remedy the mold and bacteria problem in the apartment.

The Ingolds similarly base their constructive eviction, negligence, bad faith, civil conspiracy, outrageous conduct and CCPA claims on either duties owed by Boulder Creek Apartments under the Lease or the Ingolds' exposure to environmental problems resulting from their habitation of the apartment under the Lease. Thus the factual allegations undergirding the Ingolds' claims "concern[ ] the provisions of the Lease." *See City & County of Denver*, 939 P.2d at 1366 (explaining that words such as "regarding" or "concerning" in an arbitration clause encompass all disputes relating to the subject matter of an agreement, as well as claims alleging the breach of the agreement itself). The trial court was correct to compel the Ingolds to arbitrate their tort and CCPA claims against Boulder Creek Apartments.[5]

## B.

The Ingolds are correct, however, that their claim against Boulder Creek Apartments for violation of the Wrongful Withholding of Security Deposits Act, sections 38–12–101 to –104, C.R.S. (2006) (the "Security Deposits Act"), cannot be arbitrated. The Security Deposits Act provides that "[a] landlord shall . . . return to the tenant the full security deposit deposited with the landlord by the tenant . . . ." § 38–12–103(1). "In the event that actual cause exists for retaining any portion of the security deposit, the landlord shall provide the tenant with a written statement listing the exact reasons for the retention of any portion of the security deposit." *Id.* A landlord's failure to provide this statement within the statutory time

---

**5.** The Ingolds treat their tort and CCPA claims together and make no distinction in their argument (which we ultimately reject) as to their non-

arbitrability. We leave open the question of whether CCPA claims might be deemed non-arbitrable on other grounds.

period "shall work a forfeiture of all his rights to withhold any portion of the security deposit under this section." § 38–12–103(2).

In their complaint, the Ingolds contend not only that Boulder Creek Apartments wrongfully withheld their security deposit, but that it did so willfully, thereby entitling the Ingolds to treble damages, costs and attorneys' fees. *See* § 38–12–103(3)(a). A tenant alleging willfulness under the Security Deposits Act must provide written notice to the landlord before initiating "legal proceedings." *Id.* The landlord bears the burden of persuasion "[i]n any court action." § 38–12–103(3)(b). Thus the Security Deposits Act contemplates that a tenant is entitled to pursue a claim for the wrongful withholding of a security deposit in a civil action filed in court.

The Defendants argue that the Ingolds waived their right to have their claim under the Security Deposits Act decided by a court when they entered into the arbitration provision of the Lease. We agree with the Ingolds that their claim is not subject to arbitration because the Security Deposits Act specifically precludes waiver.

■ Under section 38–12–103(7), "Any provision, whether oral or written, in or pertaining to a rental agreement whereby any provision of [the Security Deposits Act] for the benefit of a tenant ... is waived shall be deemed to be against public policy and shall be void." In *Lambdin v. District Court,* 903 P.2d 1126 (Colo.1995), we interpreted a similar non-waiver provision in the Colorado Wage Claim Act. *Lambdin* held that "[t]he plain meaning" of such non-waiver provisions "is that an agreement to arbitrate that conflicts with the rights established" by the Act "cannot be enforced...." 903 P.2d at 1130. Like the Wage Claim Act, the Security Deposits Act creates a cause of action enforceable in Colorado courts, and like the Wage Claim Act, the enforceability of the statutory cause of action *in a legal proceeding* cannot be limited or waived by an arbitration agreement. Thus an arbitration provision that would waive this cause of action in favor of mandatory arbitration is unenforceable to the extent that it applies to an action brought under the Security Deposits Act. We therefore hold that a tenant cannot be compelled to arbitrate a claim for violation of the Security Deposits Act.

## C.

For the reasons set forth above, we hold that the trial court correctly compelled the Ingolds to arbitrate their tort and CCPA claims against Boulder Creek Apartments, but erred by compelling the Ingolds to arbitrate their claim for violation of the Security Deposits Act. We therefore make the rule absolute with respect to their claim against Boulder Creek Apartments for violation of the Security Deposits Act, and discharge the rule with respect to their other claims against Boulder Creek Apartments. On remand, the trial court should compel arbitration of all of the Ingolds' claims against Boulder Creek Apartments other than their claim for violation of the Security Deposits Act.

## IV.

■ As a result of our holding today, less than all of the Ingolds' claims against Boulder Creek Apartments are arbitrable, and the Defendants concede that none of the claims against AIMCO/Bluffs and James Macias is arbitrable because neither is a party to the Lease. *See supra* at 119. The Ingolds contend that, since less than all of their claims against the Defendants in this case are arbitrable, the "intertwining doctrine" recognized by this court in *Sandefer v. District Court,* 635 P.2d 547 (Colo.1981), *overruled in part on other grounds by Sager v. District Court,* 698 P.2d 250 (Colo.1985), dictates that *none* of their claims should be arbitrated. Instead, these claims should remain before the trial court to be resolved in one proceeding.

*Sandefer* held that arbitration should be denied if the plaintiff presents both arbitrable and non-arbitrable claims requiring the resolution of identical facts. *See* 635 P.2d at 550. "To hold otherwise," *Sandefer* explained, "would risk inconsistent determinations and could result in the arbitrator's infringing upon the court's duty to decide" the non-arbitrable claims. *Id.* In reaching this decision, *Sandefer* relied principally upon the

holdings of federal courts that reached similar conclusions under the Federal Arbitration Act. *See id.* (citing, inter alia, *Miley v. Oppenheimer & Co.*, 637 F.2d 318 (5th Cir. 1981)).

The federal appellate opinions that adopted the intertwining doctrine met an unceremonious end in *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 105 S.Ct. 1238, 84 L.Ed.2d 158 (1985), where the United States Supreme Court rejected the intertwining doctrine as inconsistent with the text of the Federal Arbitration Act. The Court explained in *Dean Witter* that "[b]y its terms, the [Federal Arbitration Act] leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Id.* at 218, 105 S.Ct. 1238. By allowing the trial court to undertake an analysis of claims that is nowhere contemplated by the statute, the intertwining doctrine conflicts with the textual requirement "that agreements to arbitrate must be enforced, absent a ground for revocation of the contractual agreement." *Id.* Other considerations of judicial economy and avoiding duplicative proceedings—considerations that supported the intertwining doctrine—must yield to Congress' "preeminent concern ... to enforce private agreements into which parties had entered," a concern that required the Court to "rigorously enforce agreements to arbitrate, even if the result is 'piecemeal' litigation...." *Id.* at 221, 105 S.Ct. 1238.

This court has not directly considered the intertwining doctrine since the United States Supreme Court's decision in *Dean Witter*, and thus our court of appeals has continued to follow our opinion in *Sandefer*. *See Atmel v. Vitesse Semiconductor Corp.*, 30 P.3d 789 (Colo.App.2001) (recognizing the continuing viability of the intertwining doctrine); *Breaker v. Corrosion Control Corp.*, 23 P.3d 1278 (Colo.App.2001) (same). Indeed, the court of appeals has expanded the intertwining doctrine to include parties as well as claims.

*See Eagle Ridge Condo. Ass'n v. Metro. Builders, Inc.*, 98 P.3d 915, 920 (Colo.App. 2004) (holding that a plaintiff's suit against multiple defendants, less than all of whom were subject to an arbitration agreement, precluded arbitration and required that all claims remain before the trial court for litigation).

The Supreme Court's rejection of the intertwining doctrine—and its concomitant rejection of the federal cases upon which we relied in *Sandefer*—give us an opportunity to reconsider our adherence to the doctrine under Colorado law. Our starting point is the language of the former version of the CUAA, which again is applicable to the arbitration provision in this case.[6] *See* § 13–22–203(1), C.R.S. (2006).

The relevant provisions of the CUAA are identical to the provisions of the Federal Arbitration Act interpreted by the Supreme Court in *Dean Witter*. Under the CUAA, an arbitration agreement "is valid, enforceable, and irrevocable, save upon such grounds as exist at law or in equity for the revocation of any contract." § 13–22–203, C.R.S. (2003). Unless the existence of the arbitration agreement is disputed, "the court *shall* order the parties to proceed with arbitration ...." § 13–22–204(1) (emphasis added). This language leaves no discretion to the trial court whether to compel arbitration. The trial court's role is limited: it is to decide whether an agreement to arbitrate exists, and if it does, it must order the arbitration of all claims that fall within the scope of that agreement. *See id.* The court does not retain any authority to evaluate whether arbitration is efficient—or whether arbitration is a good idea—in light of any non-arbitrable claims brought by the plaintiff. Arbitration must be compelled if the statutory requirements are satisfied.

This interpretation of the CUAA is consistent with our precedents. As explained in *City & County of Denver*, "The right of parties to contract freely is well developed in our jurisprudence." 939 P.2d at 1361. This right "encompasses the correlative power to

---

**6.** While the facts of this case are governed by the former version of the CUAA, our analysis of the intertwining doctrine applies with equal force to the current version of the CUAA, sections 13–22–201 to –230, C.R.S. (2006), the relevant provisions of which remain the same.

agree to a specific ADR procedure for resolving disputes." *Id.* Since "[p]arties, by agreement, may substitute a different method for adjudication of their disputes than those which would otherwise be available to them in public courts of law," the CUAA is written "to interfere as little as possible with the freedom of consenting parties to achieve that objective." *Id.* at 1362–63. The intertwining doctrine unreasonably interferes with the parties' decision to arbitrate their disputes, because it allows the trial court to negate the effect of an arbitration clause without a statutory basis for doing so. Indeed, the intertwining doctrine allows a plaintiff or counterclaimant to avoid its agreement to arbitrate simply by bringing a single non-arbitrable claim. We agree with the Court's analysis in *Dean Witter* that arbitration agreements are not that mutable.

■ The doctrine of stare decisis is a fundamental component of the rule of law, as it promotes stability, certainty, and uniformity of judicial decisions. *See In re Title, Ballot Title, & Submission Clause, & Summary for 1999–2000, No. 29,* 972 P.2d 257, 262 (Colo.1999). Indeed, it "permits society to presume that bedrock principles are founded in the law rather than in the proclivities of individual[ ] [judges]. . . ." *Vasquez v. Hillery,* 474 U.S. 254, 265, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986). Although this court strongly adheres to the doctrine of stare decisis, we will overrule a prior holding if we are "clearly convinced that the rule was originally erroneous or is no longer sound because of changing conditions and that more good than harm will come from departing from precedent." *People v. Blehm,* 983 P.2d 779, 788 (Colo.1999).

In particular, we have noted that departures from stare decisis may be necessary to take into account "changes [in caselaw] that undermine or contradict the viability of prior precedent." *Friedland v. Travelers Indem. Co.,* 105 P.3d 639, 644 (Colo.2005). That is the case here. We adopted the intertwining doctrine in *Sandefer* based on federal case-

law that we found "highly persuasive" at the time. *Sandefer,* 635 P.2d at 550. That "highly persuasive" caselaw has since been repudiated by the United States Supreme Court. We agree with the Supreme Court that the intertwining doctrine, while motivated by reasonable considerations of judicial economy, did not sufficiently take into account the unequivocal language of the Federal Arbitration Act, which is identical to the language of the CUAA applicable here.

■ We therefore reject the intertwining doctrine and hold that claims that are subject to an arbitration agreement must be arbitrated regardless of their joinder with non-arbitrable claims. Claims that are not subject to arbitration should be stayed or proceed separately in litigation based on the discretion of the trial court. *Sandefer* is overruled to the extent that it recognizes the intertwining doctrine.

Our rejection of the intertwining doctrine means that, in this case, the Ingolds must arbitrate their tort and CCPA clams against Boulder Creek Apartments. It also means that the trial court must decide the Ingolds' claim against Boulder Creek Apartments for violation of the Security Deposits Act and the Ingolds' claims against AIMCO/Bluffs and Macias. The only remaining issue is whether the Ingolds' non-arbitrable claims should be stayed pending the outcome of arbitration or proceed separately.

■ The former version of the CUAA provided that the trial court has the authority to stay non-arbitrable claims until arbitration is completed.[7] *See* § 13–22–204(4), C.R.S. (2003). The decision to exercise this authority "is one left to the district court . . . as a matter of discretion to control its docket." *Moses H. Cone Mem. Hosp. v. Mercury Const. Corp.,* 460 U.S. 1, 20 n. 23, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983); *see also Pryner v. Tractor Supply Co.,* 109 F.3d 354, 361 (7th Cir.1997) ("[T]he cases, perhaps concerned lest the tail wag the dog, treat the question

---

7. The current version of the CUAA likewise gives the trial court discretion to stay the litigation of non-arbitrable claims. *See* § 13–22–207(7), C.R.S. (2006) ("If the court orders arbitration, the court on just terms shall stay any judicial proceeding that involves a claim subject to the arbitration. If a claim subject to the arbitration is severable, the court may limit the stay to that claim.").

whether to stay the entire case as discretionary in cases involving both arbitrable and non-arbitrable issues."); *Am. Recovery Corp. v. Computerized Thermal Imaging, Inc.,* 96 F.3d 88, 97 (4th Cir.1996) (same). In making this determination, the trial court should consider several factors, including (1) whether piecemeal litigation of the non-arbitrable claims could "result in inconsistent determinations" of factual and legal issues to be determined by the arbitrator, *City & County of Denver,* 939 P.2d at 1370, (2) whether piecemeal litigation will be inefficient because the factual issues to be resolved in litigation overlap with those to be decided by the arbitrator, *see Summer Rain v. Donning Co./Publishers, Inc.,* 964 F.2d 1455, 1461 (4th Cir.1992), (3) whether the arbitrable issues predominate the Ingolds' lawsuit, *see Genesco, Inc. v. T. Kakiuchi & Co.,* 815 F.2d 840, 856 (2d Cir.1987), and (4) whether the non-arbitrable claims are of questionable merit, *see id.*

In this case, the trial court did not have the opportunity to consider whether the Ingolds' non-arbitrable claims should be stayed or proceed in piecemeal litigation apart from the Ingolds' arbitration with Boulder Creek Apartments. We therefore remand the case for the trial court's consideration of whether a stay is appropriate.

### V.

Based on our holdings above, we make the rule absolute in part and discharge it in part. On remand, the trial court should order the Ingolds to arbitrate their tort and CCPA claims against Boulder Creek Apartments because these claims fall within the scope of the Lease's arbitration clause. The trial court should consider whether to stay the Ingolds' claim against Boulder Creek Apartments for violation of the Wrongful Withholding of Security Deposits Act, and their claims against Defendants AIMCO/Bluffs and James Macias, based on the considerations we described above. The case is remanded for further proceedings consistent with this opinion.