**In re J.A. WALKER CO., INC.,**
**a Colorado corporation,**
**Plaintiff**

v.

**CAMBRIA CORPORATION, a Colorado corporation; Excel Metals, Inc., a Colorado corporation; Redd Iron, Inc., a Colorado corporation; L & W Supply Corporation, d/b/a Building Specialties, Inc.; and the City and County of Denver, a municipal corporation of the State of Colorado, Defendants.**

No. 06SA272.

Supreme Court of Colorado,
En Banc.

May 29, 2007.

Dodson and Associates, P.C., Rocco A. Dodson, Golden, Colorado, Fairfield and Woods, P.C., John M. Tanner, Denver, Colorado, Attorneys for Plaintiff J.A. Walker Co., Inc.

Stettner, Miller and Cohn, P.C., Robert R. Miller, John S. Finn, Susan M. Schaecher, Denver, Colorado, Attorneys for Defendant Cambria Corporation.

Bloom Murr & Accomazzo, P.C., Joseph A. Murr, Susan A. Kraemer, Denver, Colorado, Attorneys for Defendant Redd Iron, Inc.

No appearance by or on behalf of Defendants Excel Metals, Inc., L & W Supply Corporation, or the City and County of Denver.

Justice EID delivered the Opinion of the Court.

This opinion is a companion to our decision announced today in *Ingold v. AIMCO/Bluffs, L.L.C. Apartments,* No. 06SA240, 159 P.3d 116, 2007 WL 1532155 (Colo. May 29, 2007). In *Ingold,* we held that the former version of the Colorado Uniform Arbitration Act distinguishes between two types of allegations of fraudulent inducement. Allegations of fraudulent inducement specifically directed to an arbitration agreement, including an arbitration provision in a contract, must be resolved by the trial court. Fraudulent inducement allegations directed more broadly to a contract as a whole, of which an arbitration agreement is only a part, must be resolved in arbitration.

In this case, we hold that the current version of the Colorado Uniform Arbitration Act, sections 13–22–201 to –230, C.R.S. (2006) (the "CUAA"), recognizes the same distinction between fraudulent inducement allegations. Thus the trial court—not an arbitrator—must resolve allegations that a party was fraudulently induced specifically into entering an arbitration agreement. Here, Petitioner J.A. Walker Company, Inc. ("Walker") directs its fraudulent inducement allegations specifically to the arbitration agreement relied upon by Respondent Cambria Corporation ("Cambria"), not to the parties' contract as a whole. The trial court ordered the parties to arbitrate their dispute, but the arbitration order is unclear whether the trial court resolved Walker's fraudulent inducement challenge to the arbitration agreement. We therefore make the rule to show cause absolute so that the trial court can "proceed summarily to decide," pursuant to section 13–22–207(1)(b), Walker's fraudulent inducement challenge directed specifically to the agreement to arbitrate.

## I.

We accept Walker's factual allegations as true for purposes of this proceeding. *See Rosenthal v. Dean Witter Reynolds, Inc.,* 908 P.2d 1095, 1099 (Colo.1995). In April 2004, 450 Seventeenth, LLC ("450") entered into a construction contract (the "Prime Contract") with Cambria for improvements to property

owned by 450 in downtown Denver. Cambria executed a separate contract (the "Subcontract") in May 2005 with Walker, a subcontractor, for the placement and finish of structural concrete at the project site.

While the Subcontract itself does not contain an explicit arbitration provision, it incorporates by reference the dispute resolution procedure detailed in the Prime Contract. The Prime Contract incorporates by reference a document known as the General Conditions of the Contract for Construction (the "General Conditions"). The General Conditions provides that "[a]ny Claim arising out of or related to the Contract ... shall ... be subject to arbitration."

Walker alleges that it requested but never received a copy of either the Prime Contract or the General Conditions. Walker further alleges that when it asked Cambria whether arbitration was required by the Prime Contract, Cambria assured Walker that it was not. Walker alleges that it relied on those representations when it executed the Subcontract with Cambria.

Walker subsequently filed suit seeking both payment for work that it allegedly performed and foreclosure on its mechanics' liens. In its answer to Walker's complaint, Cambria asserted that the trial court lacked jurisdiction because Walker's claims were subject to the mandatory arbitration provision of the General Conditions, incorporated by reference into the Prime Contract and applicable to Cambria by operation of the Subcontract. On similar grounds, 450 moved to compel arbitration. Walker objected, claiming it was not bound by the arbitration provision because Cambria fraudulently induced it into entering the Subcontract with assurances that the dispute resolution procedure did not include arbitration. Walker submitted several affidavits in support of its fraudulent inducement challenge.

The trial court compelled arbitration and stayed the remainder of the case. In its order, which was based on the parties' briefing and "the file in this matter," the trial court made no mention of Walker's allegations that it was fraudulently induced into

agreeing to arbitrate its dispute with Cambria. Instead, the trial court held that "the arbitration provisions incorporated into the Subcontract Agreement between the Plaintiff and Defendant Cambria Corporation through the General Conditions of the prime construction project are enforceable and valid in accordance with the Uniform Arbitration Act, C.R.S. § 13–22–201, *et seq.*" We issued a rule to show cause to consider the trial court's order compelling arbitration.[1]

## II.

Walker argues that the trial court erred in compelling arbitration because it has alleged that it was fraudulently induced into agreeing to arbitrate. We hold that section 13–22–206 requires the trial court to resolve allegations of fraudulent inducement, like Walker's, that are directed specifically to an agreement to arbitrate. Because it is unclear from the trial court's order whether it resolved this issue, we make our rule to show cause absolute and remand the case to the trial court for its determination of whether the parties' arbitration agreement was fraudulently induced.

### A.

Colorado law favors the resolution of disputes through arbitration. *See Huizar v. Allstate Ins. Co.*, 952 P.2d 342, 346 (Colo. 1998). To this end, the General Assembly enacted the CUAA, sections 13–22–201 to –223, C.R.S. (2003). The CUAA has since been revised and reenacted in its current form. *See* §§ 13–22–201 to –230, C.R.S. (2006). The current version of the CUAA applies to agreements, like the Subcontract, entered into after August 4, 2004. *See* § 13–22–203(1).

Interpreting the former version of the CUAA, we held in *Ingold* that the arbitrability of an allegation of fraudulent inducement depends upon whether the allegation is directed specifically to the agreement to arbitrate or more broadly to the contract containing the arbitration agreement. *See In-*

---

1. Walker and 450 have entered into a settlement agreement resolving the above-mentioned dispute and therefore 450 is no longer a party in this matter.

*gold,* slip op. at 12–13, 159 P.3d at 121. A fraudulent inducement claim directed specifically to the arbitration agreement is a challenge to "the existence of the agreement to arbitrate," § 13–22–204(1), C.R.S. (2003), and therefore must be resolved by the trial court under the statute. *See id.* at 9–10, 159 P.3d at 120. A fraudulent inducement claim directed to a contract as a whole—of which the arbitration agreement is only a part—is to be decided by the arbitrator, not the trial court. *See id.* at 9, 159 P.3d at 120. As explained in *Ingold,* the United States Supreme Court drew the same distinction between fraudulent inducement claims under the Federal Arbitration Act in *Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967). *See id.* at 9–10, 159 P.3d at 120.

Cambria argues that the current version of the CUAA does not distinguish between fraudulent inducement allegations in the way we recognized in *Ingold.* According to Cambria, the mere showing of an unambiguous arbitration agreement is sufficient to demonstrate that "an agreement to arbitrate exists" under section 13–22–206(2), and therefore, the arbitrator must decide all other issues concerning the enforceability of the agreement, including allegations of fraudulent inducement. We disagree.

▇ Section 13–22–206 of the current version of the CUAA recodifies the statutory distinction between challenges to arbitration agreements that we recognized in *Ingold* and that the United States Supreme Court recognized in *Prima Paint.* As under the former version of the CUAA, the current version empowers the trial court to determine "whether an *agreement to arbitrate* exists or a controversy is subject to an *agreement to arbitrate.*" § 13–22–206(2) (emphasis added). As we explained in *Ingold,* a fraudulent inducement allegation directed specifically to the arbitration agreement is a challenge to the existence of the agreement to arbitrate. *See Ingold,* slip op. at 9, 159 P.3d at 120. This is different from a situation where a party alleges fraudulent inducement of a contract as a whole. Under both the former and current version of the statute, the arbitrator must decide "whether a *contract containing*

*a valid agreement to arbitrate* is enforceable." § 13–22–206(3) (emphasis added). Cambria offers no reason for why the current version of the CUAA should be interpreted differently from the former version of the CUAA.

In this case, Walker claims it is not bound by the arbitration provision because Cambria fraudulently induced it into entering the Subcontract through assurances that the dispute resolution procedure did not include arbitration. These allegations of fraudulent inducement are specifically directed to the arbitration agreement, and consequently, must be resolved by the trial court. *See* § 13–22–206(2). Here, it is unclear whether the trial court resolved Walker's allegations of fraudulent inducement. Its order states that "the arbitration provisions incorporated into the Subcontract ... are enforceable and valid," but it does not specifically address Walker's contention that the arbitration agreement was fraudulently induced. It may be the case that it resolved the allegation of fraudulent inducement against Walker and sent the case to arbitration. But it may also be the case that the trial court did not believe that the CUAA required it to resolve the fraudulent inducement challenge and instead compelled arbitration with the expectation that the arbitrator would resolve Walker's allegations of fraudulent inducement.

Cambria argues that this court can decide Walker's challenge based on the evidence before us. It points out that Walker is a sophisticated contracting party and that there is evidence undermining Walker's allegations of fraudulent inducement. Much of Cambria's argument echoes our teaching that a party—particularly a sophisticated party—claiming fraudulent inducement faces a formidable challenge in proving its claim if the contracting parties "have access to information that was equally available to both parties and would have" dispelled the alleged fraud. *M.D.C./Wood, Inc. v. Mortimer,* 866 P.2d 1380, 1382 (Colo.1994). Walker, in turn, argues that its evidence of fraudulent inducement has gone unrebutted by Cambria, and that therefore, presumably, there is nothing left for the trial court to decide on remand other than that the Subcontract's arbitration

provision is the result of fraudulent inducement.

We decline to reach the merits of Walker's fraudulent inducement allegations. Instead, we remand the case to the trial court to "proceed summarily to decide" Walker's fraudulent inducement challenge as required by section 13–22–207(1)(b).

Section 13–22–207(1)(b) of the CUAA states that a trial court "shall proceed summarily to decide" a challenge to an arbitration agreement. Beginning with the statute's plain language, to proceed "summarily" means to "settle[ ] a controversy or dispose[ ] of [an issue] in a relatively prompt and simple manner." *Black's Law Dictionary* 1222 (7th ed.1999).

We have not previously considered the nature of the proceeding required by section 13–22–207(1)(b), but courts in other jurisdictions have held that a "summary proceeding" to determine the existence of an arbitration agreement is an expedited process that starts with the trial court considering "affidavits, pleadings, discovery, and stipulations" submitted by the parties. *Jack B. Anglin Co. v. Tipps,* 842 S.W.2d 266, 269 (Tex.1992). The court then must determine "whether material issues of fact are disputed and, if such factual disputes exist, [it must] conduct[ ] an expedited evidentiary hearing to resolve the dispute." *Haynes v. Kuder,* 591 A.2d 1286, 1290 (D.C.1991) (internal quotation omitted); *see also Grad v. Wetherholt Galleries,* 660 A.2d 903, 905 (D.C.1995); *Jack B. Anglin Co.,* 842 S.W.2d at 269. Thus an evidentiary hearing only is necessary if "the material facts necessary to determine the issue are controverted, by an opposing affidavit or otherwise admissible evidence. . . ." *Jack B. Anglin Co.,* 842 S.W.2d at 269. To require an evidentiary hearing regardless of the circumstances would defeat the benefits of arbitration. *See id.* ("Because the main benefits of arbitration lie in expedited and less expensive disposition of a dispute, and the legislature has mandated that a motion to compel arbitration be decided summarily, we think it unlikely that the legislature intended the issue to be resolved following a full evidentiary hearing in all cases."); *see also* Unif. Arbitration Act, 7 U.L.A. 1, § 7 (2000),

cmt. ("The term 'summarily' in Section 7(a) and (b) . . . has been defined to mean that a trial court should act expeditiously and without a jury trial to determine whether a valid arbitration agreement exists.").

 We believe that the uniform interpretation of "summary proceedings" offered by these courts is consistent with the language of section 13–22–207(1)(b) of the CUAA. Consequently, a trial court considering a fraudulent inducement challenge to an arbitration agreement should begin by considering the undisputed "affidavits, pleadings, discovery, and stipulations." *Jack B. Anglin Co.,* 842 S.W.2d at 269. If the material facts are undisputed, then the trial court can resolve the challenge on the record before it. *See id.* However, if the material facts are in dispute, then the trial court should proceed expeditiously in holding an evidentiary hearing to consider the disputed facts and resolve the party's challenge to the arbitration agreement.

We remand this case for the trial court to follow the procedure we have outlined in order to consider Walker's fraudulent inducement challenge.

### III.

We hold that under section 13–22–206 of the current version of the CUAA, allegations of fraudulent inducement directed to the arbitration clause itself are to be resolved by the trial court, while allegations challenging the validity of the contract as a whole are to be decided by the arbitrator. Since it is unclear whether the trial court considered Walker's fraudulent inducement challenge, we make the rule to show cause absolute and remand the case for the trial court to "summarily decide" this issue in accordance with section 13–22–207(1)(b).

Justice HOBBS dissents, and Chief Justice MULLARKEY joins in the dissent.

JUSTICE HOBBS, dissenting.

I agree with the majority that Colorado's Uniform Arbitration Act assigns to the district court the authority to determine whether an enforceable arbitration agreement ex-

ists in this case. Section 13–22–207(2), C.R.S. (2006) provides that:

On *the motion of a person alleging that* an arbitration proceeding has been initiated or threatened but that *there is not an agreement to arbitrate,* the court shall proceed summarily to decide the issue. *If the court finds that there is an enforceable agreement to arbitrate, it shall order the parties to arbitrate.*

(Emphasis added).

However, I respectfully dissent from the court's judgment because, pursuant to this statutory section, the district court found that there was an enforceable agreement to arbitrate and, consequently, ordered the parties to arbitration. The district court's order compelling arbitration of this subcontractor-prime contractor payment dispute states that the court:

FINDS that the arbitration provisions incorporated into the Subcontract Agreement between the Plaintiff and Defendant Cambria Corporation through the General Conditions of the prime construction project are enforceable and valid in accordance with the Uniform Arbitration Act, C.R.S. § 13–22–201, et *seq.* It is therefore,

ORDERED that the Motion to Compel Arbitration is GRANTED. It is further ORDERED that the Motion to Stay Further Proceedings in this action is GRANTED pending completion of arbitration between the Plaintiff J.A. Walker Company, Inc. and Defendant Cambria Corporation. As part of the stay of proceedings entered into this action, none of the remaining parties named in this action shall be required to respond or otherwise participate in this action until receiving further notice from this Court and/or the Plaintiff.

Whether an agreement to arbitrate exists is a matter of law that we review de novo. *Lane v. Urgitus,* 145 P.3d 672, 677 (Colo. 2006) (citations omitted). Written contracts that are complete and free from ambiguity will be found to express the intention of the parties and will be enforced according to their plain language. *USI Props. E., Inc. v. Simpson,* 938 P.2d 168, 173 (Colo.1997) (citation omitted). Extraneous evidence is only admissible to prove intent where there is an ambiguity in the terms of the contract; absent such ambiguity, we will not look beyond the four corners of the agreement in order to determine the meaning intended by the parties. *Id.*

We defer to the trial court's findings of fact in a contract case, if the record supports them; and we review the trial court's conclusions of law de novo. *Albright v. McDermond,* 14 P.3d 318, 322 (Colo.2000) (citations omitted). When the issue of enforcement of a contractual provision requires factual findings, it is a mixed question of law and fact, which we may review de novo. *Edge Telecom, Inc. v. Sterling Bank,* 143 P.3d 1155, 1159 (Colo.App.2006) *(citing In re Vought,* 76 P.3d 906, 913 (Colo.2003); *E–470 Pub. Highway Auth. v. 455 Co.,* 3 P.3d 18, 22–23 (Colo. 2000)).

In the context of construction projects, multiple parties are often involved. Prime contractors and subcontractors are presumed to be sophisticated business persons who can bargain with each other. In the construction business, the practice is to rely on a network of contracts to allocate rights, duties, risks, and remedies. Standard contracts are often used, and the parties are capable of customizing the contract to particular circumstances when they may choose. Accordingly, we have held subcontractors to be bound to the claims procedures and remedies contained in the prime contract when the provisions of the applicable contracts are interrelated. *See BRW, Inc. v. Dufficy & Sons, Inc.,* 99 P.3d 66 (Colo.2004).

The two applicable contracts in this case are plainly interrelated, according to their terms. The prime contract utilizes a standard industry form, AIA Document A111–1997, that contains the following arbitration clause:

**4.6 ARBITRATION**

**4.6.1.** Any Claim arising out of or related to the Contract, except Claims relating to aesthetic effect and except those waived as provided for in Sections 4.3.10, 9.10.4, and 9.10.5, shall, after decision by the Architect or 30 days after submission of the Claim to the Architect, be subject to arbitration.

Prior to arbitration, the parties shall endeavor to resolve disputes by mediation in accordance with the provisions of Section 4.5.

4.6.2 Claims not resolved by mediation shall be decided by arbitration which, unless the parties mutually agree otherwise, shall be in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association currently in effect. The demand for arbitration shall be filed in writing with the other party to the Contract and with the American Arbitration Association, and a copy shall be filed with the Architect.

In turn, the executed subcontract provides that:

> SECTION 14. *CLAIMS RESOLUTION*
> Any claims resolution procedure incorporated in the prime contract shall be deemed incorporated in this Agreement, and shall apply to any disputes arising hereunder. In the absence of a claims resolution procedure in the prime contract, the parties hereto shall not be obligated to utilize arbitration or any other non-judicial method of dispute resolution. In any dispute resolution proceeding between the parties to this Subcontract, the prevailing party shall be entitled to recover its attorneys' fees.

This subcontract also provides that the executed written agreement between the parties supersedes any prior written or oral representations:

> SECTION 4. *ENTIRE AGREEMENT*
> This Agreement represents the entire agreement between Contractor and the Subcontractor and superseded any prior written or oral representations. Subcontractor and his subcontractors are bound by the prime contract and any contract documents incorporated therein insofar as they relate in any way, directly or indirectly, to the work covered by this Agreement.

This subcontract contains nine handwritten changes that are initialed by the parties, thereby demonstrating that conscientious bargaining between the parties produced the executed subcontract. None of these interlineations alter the provisions of the subcontract that incorporate the prime contract's mediation and arbitration provisions. Thus, it is clear on the face of the prime contract and the subcontract that an arbitration agreement exists in this case.

In an effort to avoid the arbitration agreement, the subcontractor submitted three affidavits and invoked two theories in the district court: that the executed subcontract was modified by an oral agreement, and that the arbitration provision was fraudulently induced. The district court made its decision based on the written contracts and an evaluation of these affidavits. In my view, the district court's decision that an arbitration agreement exists in this case is fully supported by the written agreements.

Here, the executed subcontract provides that the written agreement is entire and negates any prior representation. Further, a sufficient allegation of fraudulent inducement would require the subcontractor to advance facts demonstrating each of the following elements: (1) the prime contractor's misrepresentation of a material fact, (2) the subcontractor's reliance on that misrepresentation, (3) the subcontractor's reliance on the misrepresentation was justifiable, and (4) justifiable reliance resulted in damage to the subcontractor. *M.D.C./Wood, Inc. v. Mortimer,* 866 P.2d 1380, 1382 (Colo.1994).

Reliance is not justifiable if another person of similar intelligence, education, or experience would not have relied on the alleged representation. *Id.* at 1383. Numerous hand written interlineations on the final executed subcontract attest the sophistication of the subcontractor in this case. Plainly, the subcontractor could have protected itself by writing in a specific provision that arbitration did not apply to the subcontract.

In addition, the artful phrasing of the affidavits and their lack of facts essential to a fraudulent inducement claim support the conclusion that the trial court did not find the affidavits to be credible or sufficient to properly raise a claim of fraudulent inducement. A trial court may determine the appropriate weight to accord attorney-drafted affidavits. *Greenemeier v. Spencer,* 719 P.2d 710, 717 (Colo.1986).

Here, the affidavits are short on facts demonstrating either reliance or reasonable reliance on an alleged conversation that an arbitration agreement did not exist in the prime contract. Significantly, the affidavit of James A. Walker, Sr., president of the subcontracting company who signed the final executed contract with the interlineated hand written changes, does not recite that (1) he asked for a copy of the prime contract before signing the subcontract that incorporated the arbitration agreement, or that (2) the parties orally modified the contract at the time of its signing, dispensing with the arbitration requirement otherwise incorporated by the subcontract on its face.

The allegation of an oral modification appears in two affidavits of subcontractor employees, Michael Gorham and Derrick Walker, who recite identically in their affidavits that:

> The Subcontract Agreement was orally modified when executed on May 26, 2005 to require judicial resolution of disputes under Section 14, by the mutual agreement and understanding of Richard Ritter and Michael Gorham that the Prime Contract did not require arbitration.

Gorham's affidavit recites that he was told by an employee of the prime contractor, Ritter, sometime before execution of the subcontract, that the prime contract did not contain an arbitration provision. But neither Gorham's affidavit nor president James Walker's affidavit recites that Gorham ever related his alleged conversation with Ritter to Walker. Based upon the evidence, the district court could have concluded that any reasonable person in the subcontractor's business would ask to see the prime contract before executing the subcontract. Yet, Walker's affidavit does not state that he asked to see the prime contract in negotiating the final version of the subcontract and signing it.

In any event, as shown by the numerous interlineations made to the subcontract leading up to its execution, the subcontractor could have insisted on a provision negating arbitration had it wished to perch the entire proposition of obtaining the job on the principle of no arbitration, only litigation, in the event of a claims dispute. Walker's affidavit is totally silent on any facts demonstrating that he raised the arbitration issue at any time when acting on behalf of the subcontractor as its signatory on the contract.

We have held that "valid contractual duties can arise out of a network of agreements involving commercially sophisticated parties who are able to bargain for an allocation of risks, duties, and remedies." *Lane,* 145 P.3d at 681; *BRW,* 99 P.3d at 73. Such a circumstance was before the district court when it reviewed the evidence in this case.

In the event of a dispute between the parties over the existence of an agreement to arbitrate, section 13–22–207(1)(b) provides, "the court shall proceed summarily to decide the issue and order the parties to arbitrate unless it finds there is no enforceable agreement to arbitrate."

In this case, we have a trial court order containing a mixed finding of fact and conclusion of law. Where the evidence is documentary in nature, as it is here, we have authority to reach our own conclusion. *Lane,* 145 P.3d at 680 *(citing Winslow Constr. Co. v. City & County of Denver,* 960 P.2d 685, 692 (Colo.1998); *M.D.C./Wood, Inc.,* 866 P.2d at 1382; *Archangel Diamond Corp. v. Lukoil,* 123 P.3d 1187, 1195 (Colo.2005)).

In my view, the district court conducted the required proceeding and found that an enforceable arbitration agreement exists between the parties. In viewing all the evidence before it, including the prime contract, the subcontract, and the affidavits, the district court found that there was a valid agreement to arbitrate in this case. In my view, under the applicable law and facts of this case, our judgment should uphold the district court's order compelling arbitration.

Accordingly, I respectfully dissent.

I am authorized to state that CHIEF JUSTICE MULLARKEY joins in this dissent.